662 So.2d 1141 (1995)
SPRING HILL LIGHTING & SUPPLY COMPANY, INC.
v.
SQUARE D COMPANY, INC., et al.
1930027.
Supreme Court of Alabama.
April 14, 1995.
Rehearing Denied June 23, 1995.
*1142 James L. Shores, Fairhope, for appellant.
Edward S. Sledge III and P. Russel Myles of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, for David Volkert & Associates, Inc. and Nelson Russell.
William A. Robinson and Cecil H. Macoy, Jr. of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Mobile, for Square D Co. and David Hartselle.
*1143 C. Robert Gottlieb, Jr., Geary A. Gaston and William W. Watts III of Reams, Philips, Brooks, Schell, Gaston & Hudson, P.C., Mobile, for James R. Diamond.
PER CURIAM.
The plaintiff, Spring Hill Lighting, Inc., appeals from a summary judgment in favor of the defendants on Spring Hill's claims alleging fraud, intentional interference with business relations, and conspiracy. The defendants are James R. Diamond, an electrical engineer employed by the Alabama State Docks Department; David Volkert & Associates, Inc. ("Volkert"), an engineering firm that contracted with the Docks Department to design and oversee construction of the project that is the subject of this controversy; Nelson Russell, the manager of Volkert's electrical engineering department; Square D Company, Inc., a manufacturer of electrical equipment; and David M. Hartselle, Square D's senior sales representative in Mobile. Spring Hill distributes electrical equipment manufactured by Siemens Energy & Automation, Inc. The alleged fraudulent misrepresentation is the published statement that the specification of Square D equipment only set a definite standard and did not mean that the Docks would not consider for approval equipment that was equal to Square D equipment. The alleged interference with business relations consists of alleged acts by which the plaintiff says the defendants prevented Spring Hill from selling Siemens equipment for use on the Docks project at issue.
Spring Hill states the issues as being whether there was substantial evidence in support of its two substantive claims and its claim alleging that the defendants conspired to do the alleged wrongs. Diamond asserts that he is immune from liability in this action because he was performing discretionary functions on behalf of the State of Alabama; that this action is barred by certain sections of the Code of Alabama that provide for injunctive relief against contracts let in violation of the Competitive Bid Law; that there is no substantial evidence of any misrepresentation by Diamond, of any intent on his part not to perform, or of any damage proximately caused by any fraud; that there is no substantial evidence of any knowledge of a business relationship or of any conduct interfering with such a relationship; and that there is no evidence of a conspiracy to commit either of the alleged wrongs. Volkert and Russell similarly argue that the injunctive remedies provided by statute are exclusive of any remedy for damages, and that there was not substantial evidence of the alleged wrongful conduct. Square D and Hartselle make similar arguments.
In July 1990, the Alabama State Docks Department released an invitation for bids, publishing plans and specifications for rehabilitation of and additions to its Pier C in Mobile. Spring Hill submitted to E.H. Smith & Sons Electrical Contractors, Inc. ("Smith Electric"), a proposal to provide the electrical substation for the project. The substation includes high voltage switchgear, a transformer, and a low voltage or secondary switchboard. Spring Hill proposed to provide Siemens products for the substation. Smith Electric submitted a proposal to Ray Sumlin Construction Company that included Spring Hill's quotation. Sumlin included Smith Electric's proposal in its bid and was awarded the contract. Sumlin subcontracted the electrical work to Smith Electric, but Smith Electric ultimately did not buy the substation equipment from Spring Hill, because Diamond refused to accept the Siemens equipment as conforming to the specifications.
The specifications for the substation required that "The transformer shall be as manufactured by Square D or equal." The switchgear specifications also made reference to Square D equipment. Section 16.02M governed substitutions for equipment described in the specifications by manufacturer name:
"Substitution of Equipment and Materials. Equipment and materials specified herein by catalog number and/or manufacturer represents a standard of quality and design required. Any proposed substitution shall be submitted no less than ten (10) days prior to the bid date. No substitution shall be assumed as acceptable without *1144 being properly submitted to the Engineer for approval...."
Section SP-21 also concerned substitution of materials, stating:
"Whenever a definite material is specified by manufacturer's name and model, it is not the intention to discriminate against any equal product made by another manufacturer, which in the opinion of the Engineer will perform the same function equally as well as the material specified. It is rather the intention to set a definite standard as to class of material required for the particular application. The Contractor shall not substitute other products without first receiving written approval from the Owner or his representative."
The Docks Department issued the invitation for bids on July 8, 1990, and the bids were due on August 3, 1990. This due date was changed to August 10 when the second addendum to the specifications was issued on July 23.
Brian M. Brey, a Siemens sales representative, submitted to Volkert on July 17 a list of Siemens equipment proposed as substitutes of a quality equal to that of the named Square D equipment. Russell, on behalf of Volkert, wrote to Diamond, who was the project electrical engineer for the Pier C project, on August 6, recommending that the Siemens request be approved contingent on satisfaction of nine conditions. Also on August 6, Diamond, with Russell's approval, issued Addendum Number 4, which included the following Item Number 5:
"Reference SPECIFICATIONS, DIVISION III, Article 16.12 SWITCHGEAR. Add a new paragraph as follows:
"I. The unit substation switchgear sections which include the high voltage, transformer and secondary distribution switchboard are to be manufactured by a single source."
Although this addendum was issued only four days before the bids were due, the Docks Department did not extend the bid deadline so that proposals for substitutions offered in compliance with this addendum could meet the 10-days-prior-to-bids requirement of Section 16.02M.
On August 7, Diamond sent Brey a response to his request, stating, "Tentative approval is predicated upon successfully resolving the following," and listing the nine conditions described by Russell. Neither Russell's letter to Diamond nor Diamond's letter to Brey mentioned Item 5 of Addendum 4.
Further discussions about approval of the Siemens equipment took place, and when those were unsuccessful Spring Hill attempted to obtain approval of a Minnesota supplier of Square D products, American Midwest Power ("AMP"). During this process, Hartselle telephoned A.W. McPhillips, a Spring Hill vice president, who gave the following deposition testimony:
"I got it from David Hartselle on the telephone one time that nothing was going to be approved but Square D. He told me he would have a last look at everything.
"Q. When did he tell you that?
"A. Telephone conversation one time shortly after the bid was let.
". . . .
"... We had a conversation for probablyin the neighborhood of five minutes or so. I don't recall all of it. The pertinent facts that I do recall were that Mr. Hartselle told me that there was no way in the world I would be able to buy any Square D in this town or anywhere else; that he would ensure that I couldn't. Mr. Hartselle told me that only Square D would be approved because he had final say-so on what went through there."
The AMP request was rejected, and Smith Electric canceled its order with Spring Hill and obtained Square D equipment for the substation. Spring Hill thereafter brought this action.
Spring Hill asserts that Item 5 of Addendum 4, the "single source requirement," was added for the sole purpose of preventing the approval of Siemens equipment, because Diamond and Russell were aware that Siemens transformers were manufactured by another company. Spring Hill asserts that it is immaterial that the transformer was manufactured by a company other than Siemens, because it was manufactured according to Siemens's specifications and was covered by *1145 a Siemens warranty, and because this was common practice in the industry; Russell acknowledged in a later meeting that even Square D uses transformers manufactured by a subsidiary company. Spring Hill also contends that Diamond, Russell, and Hartselle conspired from an early stage of the development of the plans and specifications to prevent the approval of any electrical equipment other than Square D. Thus, Spring Hill contends that the defendants fraudulently caused the plans and specifications to falsely represent that equipment from other manufacturers would be considered without discrimination, and that they intentionally interfered with Spring Hill's business relations with Smith Electric.
Part of Spring Hill's evidence in support of these contentions is the following deposition testimony by Eddie Smith, the president of Smith Electric:
"... I don't think it would matter whatI've been told that it didn't matter what we submitted, it wasn't going to be approved.
"Q. Who told you that?
"A. Square D man, David Hartselle.
". . . .
"Q. David Hartselle told you that well, what did he tell you?
"A. Well, shortly after the job bid, David came to the office and said he wanted to talk to me. So we sit there in my office and David says what do you intend to do with the power portion of this job. I said, David, I am going to give it to the person that was low bidder with me when I bid the job. I've already listed it on Ray Sumlin's bid form. And he says thathis exact words werebecause I remember this well because it made meit upset me that I just couldn't believe that something like this could go on. He says we've been involved in this project since conception, now Square D had been involved in the design working on this project, and the specs were written in such a way that no one would get approved but Square D. And he said you can either deal with me now or later. My response to him was I said, David, this is a state job that's got state money in it. I said this is stuff people get put in jail for. He said, well, I may have said too much; but you'll be back to see me. I said, well, I think you're wrong because Spring Hill Lighting and Siemens are big enough that they can take care of themselves, and they will do what it takes to get the job done."
(Emphasis added.)

Exclusivity of Statutory Remedies
Section 41-16-31, Ala.Code 1975, is part of Article 2, "Competitive Bidding on Public Contracts Generally," within Title 41, Chapter 16. That section provides:
"Any taxpayer of the area within the jurisdiction of the awarding authority and any bona fide unsuccessful bidder on a particular contract shall be empowered to bring a civil action in the appropriate court to enjoin execution of any contract entered into in violation of the provisions of this article."
Article 3, "Competitive Bidding on Contracts of Certain State and Local Agencies, etc.," provides for bidding on contracts let by municipalities, school boards, and other entities. It is very similar to Article 2, and includes § 41-16-61, which is identical to § 41-16-31. These Articles are commonly known as the Competitive Bid Law. See, e.g., Crest Construction Corp. v. Shelby County Bd. of Educ., 612 So.2d 425, 431-32 (Ala.1992).
The defendants cite cases from this Court as holding that §§ 41-16-31 and 41-16-61 provide the only remedy for allegations that the State or another public body has entered into a contract in violation of the Competitive Bid Law. However, none of those cases addressed a tort action alleging intentional wrongful conduct by individuals involved in the bidding process.
City of Montgomery v. Brendle Fire Equipment, Inc., 291 Ala. 216, 279 So.2d 480 (1973), was an action against the City of Montgomery for an injunction against the City's entering into contracts in the future in violation of the Competitive Bid Law. The Court reversed the circuit court's injunction, holding:
"The statute makes available the equitable remedy of an injunction on a `particular *1146 contract.' This wording does not contemplate enjoining future contractual arrangements. Also the statute provides for enjoining the `execution' of any contract which is violative of [Title 55,] Chapter 22 [Code 1940 (Recompiled 1958) (now Title 41, Chapter 16)], not the formation of contracts to be made in the future which may run afoul of Chapter 22. To interpret the statute as Brendle suggests would unduly strain the construction of unambiguous language and provide a remedy not intended by the legislature."
291 Ala. at 220, 279 So.2d at 484 (emphasis in original).
In Jenkins, Weber & Associates v. Hewitt, 565 So.2d 616 (Ala.1990), a disappointed bidder had brought an action "pursuant to Ala. Code 1975, § 41-16-1 et seq., the Alabama Competitive Bid Law." Id., at 617. The Court held:
"City of Montgomery [v. Brendle Fire Equipment, 291 Ala. 216, 279 So.2d 480 (1973),] established the remedy pursuant to Title 55, § 515 [now § 41-16-31], as one for injunctive relief. Jenkins, Weber's complaint, as amended three times, did not seek injunctive relief pursuant to § 41-16-31, but rather claimed monetary damages.
"We find nothing in the legislative history of § 41-16-31 nor in the cases interpreting that statute that allows an unsuccessful bidder to sue for monetary damages. In Urban Sanitation Corp. v. City of Pell City, 662 F.Supp. 1041, 1044 (N.D.Ala.1986), a federal district court interpreting that statute stated:
"`There is no indication in this statute, however, that an unsuccessful bidder has any right or expectancy to insist upon the award of a contract. To the contrary, the statute is carefully crafted to limit the remedy to "enjoin[ing] execution of any contract entered into in violation of the provisions of this article." When the statute is unambiguous, its expressed intent must be given effect and there is no room for construction.'
"(Citation omitted.)
"Jenkins, Weber contends that the decision not to award it the contract was arbitrary and capricious, and it relies on White v. McDonald Ford Tractor Co., 287 Ala. 77, 248 So.2d 121 (1971); International Telecommunications Systems v. State, 359 So.2d 364 (Ala.1978); Arrington v. Associated General Contractors of America, 403 So.2d 893 (Ala.1981), cert. denied, 455 U.S. 913, 102 S.Ct. 1265, 71 L.Ed.2d 453 (1982); and Mobile Dodge, Inc. v. Mobile County, 442 So.2d 56 (Ala.1983). However, those cases dealt with injunctive relief and do not control this case, because Jenkins, Weber sought monetary damages rather than injunctive relief.
"We, therefore, conclude that the summary judgment in favor of the defendants was proper, because Jenkins, Weber failed to state a claim cognizable under Code § 41-16-31."
Id., 617-18 (footnote omitted). As can be seen from the above quotation, Jenkins, Weber did not bring a tort action alleging intentional wrongful conduct, but instead attempted "to state a claim cognizable under Code § 41-16-31."
In Crest Construction Corp. v. Shelby County Bd. of Educ., 612 So.2d 425, 431-32 (Ala.1992), the Court rejected an argument that a "disappointed bidder" should be allowed "to recover bid preparation expenses." Again, the action simply alleged that the county board had violated the Competitive Bid Law by declaring one other than the plaintiff to be the lowest responsible bidder, even though the board had prequalified the plaintiff. No issue as to intentional tortious conduct was presented.
In Tectonics, Inc. v. Castle Construction Co., 496 So.2d 704 (Ala.1986), the Court answered a certified question asking whether it would use the federal "`Small Business Act as a standard in determining fraud, unjust enrichment or interference with a business relationship,' in a suit brought by the second lowest and unsuccessful bidder against the lowest and successful bidder on a government contract," 496 So.2d at 704. The Court recited the fact that the plaintiff Tectonics had not challenged the determination that the defendant Collins Company, Inc., was a small business and therefore was entitled to bid on the contract at issue. The Court then *1147 stated: "For this Court to allow Tectonics to maintain an action now in state court would be to nullify the federal government's determination that Collins was a small business." Id., at 705 (emphasis in original). The Court continued:
"Moreover, the Court has refused to confer a state cause of action in favor of an unsuccessful bidder on a municipal procurement:
"`The provision for letting the contract to the lowest responsible bidder is for the benefit of the public and does not confer on a bidder any right enforceable at law or in equity. ...'" (Emphasis added.)
"Townsend v. McCall, 262 Ala. 554, 558, 80 So.2d 262, 265 (1955).
"In light of this pronouncement in Townsend and in light of the fact that the Small Business Act is a federal law which does not confer a federal cause of action in favor of an unsuccessful bidder, this Court sees absolutely no logic in interpreting the Small Business Act to allow a state cause of action.
"This Court would not use the Small Business Act as a standard in determining fraud, unjust enrichment, or interference with a business relationship in a suit brought by the second lowest and unsuccessful bidder against the lowest and successful bidder on a government contract."
496 So.2d at 705-06 (emphasis in Tectonics). Because the certified question simply asked whether the Court would use the Small Business Act as a standard in assessing the described tort claims, the Court's reference to Townsend v. McCall, 262 Ala. 554, 558, 80 So.2d 262, 265 (1955), was purely dictum. Townsend was an action to enjoin the execution of a contract, and it does not address the question whether injunctive relief is the exclusive remedy in such cases.
Urban Sanitation Corp. v. City of Pell City, 662 F.Supp. 1041 (N.D.Ala.1986), quoted in Jenkins, Weber & Associates, supra, presented a question whether the Competitive Bid Law created a property right that would support an action by an unsuccessful bidder under 42 U.S.C. § 1983. The court found no such property right.
Of the above cases, only the federal action underlying the certified question answered in Tectonics involved a claim alleging intentional torts. Four Justices dissented, with an opinion by Justice Adams, expressing the opinion that the Small Business Act's definitions and determinations should be allowed as evidence in regard to the state causes of action, even though that Act did not create a "standard" in the sense of creating a cause of action based on that law. The dissenters expressed the opinion that the claims of fraud, unjust enrichment, and interference with business relations "are indeed viable causes of action under Alabama law." 496 So.2d at 707-08. The majority opinion held only that "This Court would not use the Small Business Act as a standard in determining fraud, unjust enrichment, or interference with a business relationship in a suit brought by the second lowest and unsuccessful bidder against the lowest and successful bidder on a government contract." Id., at 706. Although the language referring to Townsend v. McCall, 262 Ala. 554, 558, 80 So.2d 262, 265 (1955), implied that the action would not lie, the majority did not definitively express the opinion that the federal court should dismiss the claim.
Upon full consideration of the question, we hold that an action such as this one, alleging intentional wrongful conduct by persons involved in the bidding process, is not necessarily barred by the potential availability of injunctive relief pursuant to Ala.Code 1975, §§ 41-16-31 and 41-16-61. The remedy of injunctive relief provides no sanctions against intentional wrongful conduct by individuals involved, and we see no reason why such individuals should be shielded from responsibility for such intentional wrongful conduct.
Injunctive relief is seldom granted in actions alleging violations of the Competitive Bid Law. Compare Crest Constr. Corp. v. Shelby County Bd. of Educ., 612 So.2d 425 (Ala.1992); Steeley v. Nolen, 578 So.2d 1278 (Ala.1991); Horne Wrecker Service, Inc. v. City of Florence, 567 So.2d 1285 (Ala.1990); Advance Tank & Constr. Co. v. Arab Water Works, 910 F.2d 761 (11th Cir.1990) (applying *1148 Alabama law); Hospital Systems, Inc. v. Hill Rom, Inc., 545 So.2d 1324 (Ala.1989); McCord Contract Floors, Inc. v. City of Dothan, 492 So.2d 996 (Ala.1986); J.F. Pate Contractors v. Mobile Airport Authority, 484 So.2d 418 (Ala.1986); Mobile Dodge, Inc. v. Mobile County, 442 So.2d 56 (Ala.1983); International Telecommunications Systems v. State, 359 So.2d 364 (Ala.1978); White v. McDonald Ford Tractor Co., 287 Ala. 77, 248 So.2d 121 (1971); Townsend v. McCall, 262 Ala. 554, 80 So.2d 262 (1955); Mitchell v. Walden Motor Co., 235 Ala. 34, 177 So. 151 (1937); and Carson Cadillac Corp. v. City of Birmingham, 232 Ala. 312, 167 So. 794 (1936), all denying injunctive relief, with Kennedy v. City of Prichard, 484 So.2d 432 (Ala.1986), and Arrington v. Associated General Contractors of America, 403 So.2d 893 (Ala.1981), cert. denied, 455 U.S. 913, 102 S.Ct. 1265, 71 L.Ed.2d 453 (1982), both granting injunctive relief. While it is appropriate to create a restrictive standard for interfering with the normal progress of government works, the statements in the cases discussed above indicating that the injunctive remedy is the only remedy for violation of the Competitive Bid Law were not intended to create a license for persons to commit fraud and other intentional torts.
Even the potential availability of injunctive relief does not necessarily protect the defrauded party, because the intentional tort may not support the granting of injunctive relief. This case illustrates the likelihood that the statutory provision for injunctive relief will prove ineffective to prevent wrongful conduct. Spring Hill quoted to Smith Electric a price of $114,597 for the substation. Smith Electric included this price as part of its proposal to Sumlin Construction that it would perform as the electrical subcontractor for the sum of $792,850. Sumlin Construction was the low bidder on the Pier C project, bidding $9,431,348. A court would be reluctant to enjoin an entire project based on a complaint by a supplier of materials worth only a little more than 1% of the value of the entire project. Nevertheless, if Spring Hill's evidence is viewed most favorably to Spring Hill's allegations and all reasonable inferences in support thereof are drawn, it appears that the defendants may have intentionally defrauded Spring Hill and interfered with its business.
For the foregoing reasons, we hold that an action alleging intentional wrongful conduct by persons involved in a bidding process is not subject to a summary judgment solely on the basis that the injunctive relief afforded by §§ 41-16-31 and 41-16-61 is the sole remedy for violations of the Competitive Bid Law.

Immunity
The State of Alabama "shall never be made a defendant in any court of law or equity." Ala. Const.1901, art. I, § 14. The State Docks Department is clothed with this immunity, and its employees are also, under certain circumstances. Alabama State Docks v. Saxon, 631 So.2d 943 (Ala.1994); Jones v. Alabama State Docks, 443 So.2d 902 (Ala.1983). Diamond, as an employee of the Docks Department, asserts that he is immune from liability in this action.
"Clearly, a state officer or employee is not protected by § 14 when he acts willfully, maliciously, illegally, fraudulently, in bad faith, beyond his authority, or under a mistaken interpretation of the law. See Lumpkin v. Cofield, 536 So.2d 62, 65 (Ala. 1988); Barnes [v. Dale, 530 So.2d 770, 782 (Ala.1988)]; DeStafney v. University of Alabama, 413 So.2d 391, 393 (Ala.1981); Gill v. Sewell, 356 So.2d 1196, 1198 (Ala. 1978); Unzicker v. State, 346 So.2d 931, 933 (Ala.1977); and St. Clair County v. Town of Riverside, 272 Ala. 294, 296, 128 So.2d 333, 334 (1961)."
Phillips v. Thomas, 555 So.2d 81, 83 (Ala. 1989). Because this action can proceed only on allegations of intentional wrongdoing, the defendants are not protected by immunity.

Fraud
Spring Hill's allegation of fraud is that the defendants falsely caused the plans and specifications to represent that the specification of material by a manufacturer's name did not represent an intention to discriminate against other manufacturers, but only represented a definite standard. The defendants contend that the evidence supported their *1149 summary judgment motions and that Spring Hill's evidence did not present a genuine issue of material fact on any of the elements of fraud.
The elements of fraud are (1) a false representation (2) of a material existing fact (3) on which the plaintiff justifiably relies (4) and damage proximately caused by the plaintiff's reliance. Allstate Ins. Co. v. Hilley, 595 So.2d 873, 875 (Ala.1992); General Motors Acceptance Corp. v. Covington, 586 So.2d 178, 181 (Ala.1991). The defendants contend that the alleged fraud is "promissory fraud." In promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it. Walker v. Woodall, 288 Ala. 510, 513, 262 So.2d 756, 759 (1972).
"Neither [Ala.Code 1975, § 6-5-101] nor [Ala.Code 1975, § 6-5-103] [speaks] of future occurrences. They both refer to `a material fact,' which is then existing. As to promises (or opinions) there must have been at the time an intention not to do the act promised (an existing status) and [there must be a showing] that it was made with the intent to deceive."
Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 664, 68 So.2d 314, 321 (1953).
We question whether the allegation of fraud is necessarily an allegation of promissory fraud. If the misrepresentation is that the specification of Square D products for the substation did not represent discrimination against other manufacturers, that is not necessarily a representation regarding a future act. However, even accepting the defendants' characterization that the alleged misrepresentation is that the defendants would fairly consider alternative submissions, there is substantial evidence that the defendants had no intention to do so at the time the invitation to bid was issued.
The defendants also argue that there is no evidence that they made any false representation, because the Docks Department, not any of these defendants, published the plans and specifications. However, Volkert drew the specifications, and Russell conferred with Hartselle in preparing the electrical specifications for the project. There is substantial evidence that Diamond, Russell, and Hartselle conspired to cause the specifications to falsely represent that the specification of Square D products for the substation did not indicate improper favoritism for Square D. Thus, whether directly under the fraud count or indirectly through the conspiracy count, a jury could find that the defendants falsely made the representation.
The defendants assert that Spring Hill suffered no damage as a result of any reliance on the alleged misrepresentations. They argue that the failure to approve the Siemens equipment was the result of Brey's failure to complete the request for approval, not the result of any misconduct on their part. They cite the following facts: After Brey submitted responses to the nine conditions for which Russell requested clarification, he was asked for further clarification on three of them. He never submitted any such information. The defendants assert that he misinterpreted the single-source requirement as precluding the use of Siemens equipment, when, they say, the Siemens equipment would have met that requirement because the transformer was manufactured to Siemens's specifications and was warranted by Siemens. This argument ignores the fact that Diamond wrote a letter to Brey telling him that Siemens would not be approved, because of the single-source requirement. On August 23, 1990, Brey wrote Diamond a letter that included the following:
"The question about a single line manufacture on the substation was brought up and can be answered by saying that Siemens' name and warranty applies to the complete substation. This warranty extends to all components including lugs, bus bars and transformer components. It is Siemens' understanding that the intent of this specification is to insure that there is a single manufacture[r] taking responsibility (not a Westinghouse switch with a Siemens Transformer with a GE secondarythree manufacture[r]s and three warranties)."
Diamond wrote back the following day, informing Brey that "The Siemens/ITE transformer may not be manufactured by Siemens *1150 ITE. If this is the case, Addendum No. 4, item 5 would not be satisfied." Thus, contrary to the position now taken by the defendants, Brey did take the position that the Siemens equipment could meet the single-source requirement, but Diamond responded that it could not. Thus, there was no point in Brey's addressing the other three conditions that Diamond, in the same letter, said needed further clarification, and the defendants have not established that the failure to obtain approval of Siemens occurred because Brey did not pursue it.
Spring Hill can show lost profits as damage. Sumlin Construction was awarded the contract, and it subcontracted the electrical work to Smith Electric. Smith Electric contracted with Spring Hill to buy the substation equipment, but had to cancel that order when Diamond did not approve the Siemens equipment.
To avoid unduly lengthening the opinion, we have omitted other evidence cited by the parties as tending to support or to defeat the fraud claim. The discussion above shows that Spring Hill submitted substantial evidence in support of the fraud claim and that the circuit court erred in entering the summary judgment on that claim.

Intentional Interference with Business Relations
The elements of a cause of action for intentional interference with business or contractual relations are: (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of the defendant's interference. Justification or competitor's privilege may be presented as a defense. Soap Co. v. Ecolab, Inc., 646 So.2d 1366 (Ala.1994); Joe Cooper & Assocs., Inc. v. Central Life Assur. Co., 614 So.2d 982 (Ala.1993); Century 21 Academy Realty, Inc. v. Breland, 571 So.2d 296 (Ala.1990); Gross v. Lowder Realty Better Homes & Gardens, 494 So.2d 590 (Ala.1986).
The defendants argue that there is no evidence that they were aware of the business relation between Spring Hill and Smith Electric; rather, they say, they simply knew that Siemens was applying for approval of its products as substitutes for the specified Square D products. However, Spring Hill presented evidence regarding a Siemens substation that had been installed in an earlier Docks Department project, Pier B. There was evidence that Diamond knew that Spring Hill had supplied that Siemens equipment. From this evidence, a jury could infer that the defendants knew that the proposed Siemens equipment would be supplied through Spring Hill.
The evidence discussed above presents a jury question on the issue of intentional interference. Particularly pertinent to this aspect of the claim is Diamond's insistence that the single-source requirement required a single manufacturer, not simply a single responsible manufacturer that would provide warranties for the entire substation. That insistence is rendered suspect by the minutes of a meeting held at Volkert's office on January 4, 1991, as an attempt to resolve the substation controversy. Present were James Hancken, general manager for engineering for the Docks Department; J.R. Sute, Volkert's vice president for operations; W.R. Bramer, Volkert's Pier C construction manager; Patrick J. Wilson, Volkert's Pier C project engineer, and Russell. The minutes, in regard to the single-source requirement, read:
"The specification requirements that the subject electrical gear is to be `manufactured by a single source' was discussed. Mr. Bramer said it is his understanding that many electrical manufacturers use outside sources to furnish some items of equipment. Mr. Russell agreed but noted the most reputable manufacturers (G.E., Westinghouse, and Square D) furnish this equipment under their nameplate and under their warranty. Mr. Russell noted that the transformers furnished by Square D are manufactured by Sorgel, but that this company is a wholly-owned subsidiary of Square D. Mr. Sute made the point that the specification use of the word `manufactured' may have not been the best choice here. He suggested that use of the term `supplied and warranted by a single source' would have been a better choice of *1151 words. Mr. Russell agreed and stated that this certainly was the intent of the specs."
Brey's August 23 letter established that Siemens could meet a "supplied and warranted by a single source" requirement, but Diamond responded the next day with insistence that the requirement meant what it said, that the substation components must be manufactured by a single source. A jury could find that the single-source requirement was not honestly imposed (because even Square D arguably could not meet it and because the later-asserted justification was a need for a single warranty and a single party responsible for repair), but was imposed solely as part of a conspiracy by the defendants to prevent the approval of any equipment other than Square D equipment. This, along with other evidence, constitutes substantial evidence that the defendants intentionally interfered with Spring Hill's business relation with Smith Electric.
Spring Hill has shown damage by virtue of Smith Electric's cancellation of its order from Spring Hill. The defendants may have justification defenses to assert, but the evidence does not support such a defense as a matter of law. Similarly, Square D and Hartselle may be able to assert a competitor's privilege defense, but the evidence does not support a ruling that there is no genuine issue of material fact on this question. See Soap Co. v. Ecolab, Inc., supra.
For the foregoing reasons, we hold that the circuit court erred in entering the summary judgment for the defendants.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, KENNEDY, INGRAM, and BUTTS, JJ., concur.
MADDOX, HOUSTON, and COOK, JJ., dissent.
SHORES, J., recused.
HOUSTON, Justice (dissenting).
The dispositive issue is whether the remedy provided by the Alabama Competitive Bid Law[1] is an exclusive remedy that preempts Spring Hill's entire action. In my opinion, based upon long established precedent, which the majority opinion does not overrule, Ala. Code 1975, § 39-5-4[2] and § 41-16-31[3], provide an exclusive remedy. Crest Construction Corp. v. Shelby County Board of Education, 612 So.2d 425, 432 (Ala.1992) (Ala. Code 1975, § 41-16-61, prevents awards of compensatory damages); Jenkins, Weber & Associates v. Hewitt, 565 So.2d 616, 618 (Ala. 1990) ("We find nothing in the legislative history of § 41-16-31 nor in the cases interpreting that statute that allows an unsuccessful bidder to sue for monetary damages."); Tectonics, Inc. v. Castle Construction Co., 496 So.2d 704, 705-06 (Ala.1986) (because this Court had refused to confer a state cause of action in favor of an unsuccessful bidder under the Alabama Competitive Bid Law, and because federal law did confer a federal cause of action, this Court refused to interpret the Small Business Act to allow a state cause of action); Townsend v. McCall, 262 Ala. 554, 558, 80 So.2d 262 (1955) ("The provision for letting the contract to the lowest responsible bidder is for the benefit of the public and does not confer on a bidder any right enforceable at law or in equity.").
The stated purpose behind the Competitive Bid Law is to get the best quality equipment at the lowest possible price. J.F. Pate Contractors v. Mobile Airport Authority, 484 So.2d 418, 421 (Ala.1986). It is because Alabama's competitive bid provisions are designed for the public's benefit, and not for the benefit of those vying for public funds, *1152 that the legislature created an exclusive remedy for those who contend that a public contract has been let or administered in violation of the Competitive Bid Law. The Code provides that the attorney general, any taxpayer, an unsuccessful bidder, or any interested citizen may sue to enjoin the execution of any contract entered into in violation of the Competitive Bid Law's provisions. See § 39-5-4; § 41-16-3; and § 41-16-61. In this case, Spring Hill does not seek to enjoin the letting or execution of the contract or the payment of public funds under the contract.
The policy of the legislature in enacting the Competitive Bid Law was to protect the public purse; and this Court has proclaimed that to be the policy for the past 40 years.
If it is a felt necessity that this Court must change our established law, why do it in this case, when Spring Hill has not sought to protect the public purse, but only to personally profit? Certainly, a monetary reward should be available only after the public has benefited from an unsuccessful bidder's efforts; otherwise, we are changing our law and policy by molar, rather than molecular, motions. In short, we are legislating, and not interstitially.[4]
MADDOX, J., concurs.
NOTES
[1] Ala.Code 1975, §§ 41-16-20 through 41-16-63; §§ 39-5-1 through 39-5-6.
[2] "An action shall be brought by the Attorney General or may be brought by any interested citizen, in the name and for the benefit of the state, to recover from the awarding authority, contractor or their sureties or any person receiving funds under any public works contract let in violation of or contrary to this title or any other provision of law."
[3] "Any taxpayer of the area within the jurisdiction of the awarding authority and any bona fide unsuccessful bidder on a particular contract shall be empowered to bring a civil action in the appropriate court to enjoin execution of any contract entered into in violation of the provisions of this article."
[4] Southern Pacific Co. v. Jensen, 244 U.S. 205, 218-23, 37 S.Ct. 524, 529-32, 61 L.Ed. 1086 (1917) (Holmes, J., dissenting).