James Harrell Hammonds appeals from a judgment based on a jury verdict in favor of George Turnipseed. This case is before this court pursuant to § 12-2-7(6), Ala. Code 1975.
In December 1995 Turnipseed, a licensed real estate broker, sued Hammonds, seeking *Page 40 
damages for the breach of an express/implied contract to pay a 10% real estate sales commission. Turnipseed also sought damages for work and labor done, fraud, and conspiracy. We would note that Turnipseed named other defendants in his complaint. Those defendants, however, are not parties to this appeal.
The case proceeded to trial in March 1997. At trial, Hammonds filed a motion for a directed verdict, which the trial court granted against Turnipseed on his claims of breach of express/implied contract, work and labor done, and conspiracy. Thereafter, the trial court submitted the case to the jury on the sole issue of promissory fraud. The jury ultimately returned a verdict in favor of Turnipseed and awarded him 10% of the purchase price. The trial court entered a judgment based on that verdict.
Thereafter, Hammonds filed a post-judgment motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, for a new trial. Following a hearing, the trial court denied that motion.
Hammonds appeals.
Initially, we would note that this court, in Martino v.Bruno's, Inc., 681 So.2d 602, 604 (Ala.Civ.App. 1996) (citations omitted), stated the following well-settled law regarding jury verdicts:
 "[J]ury verdicts are presumed correct and . . . this presumption is strengthened on a trial court's denial of a motion for [a] new trial. Indeed, a trial court's ruling on a motion for [a] new trial should not be disturbed on appeal unless some legal right has been abused and unless the record plainly and palpably shows the trial court to be in error. A motion for a JNOV simply provides the trial court with an opportunity to review its earlier ruling denying a motion for a directed verdict. These motions permit the trial court to determine whether the nonmovant has presented substantial evidence to support each element of [his] cause of action or defense. Thus, in reviewing a motion for a directed verdict or for a JNOV, this court must view all the evidence in a light most favorable to the nonmovant and must consider such reasonable evidentiary inferences as the jury could freely draw."
Our review of the record reveals the following: Hammonds owns several thousand acres of land in Lowndes County, Alabama. The evidence is undisputed that Hammonds has bought and sold property since 1987 and that he is very knowledgeable about real estate. Furthermore, it is undisputed that Hammonds is very familiar with real estate brokers and understands that they earn their living from real estate commissions.
In the instant case Hammonds authorized Turnipseed, as well as other brokers, to show his property to prospective buyers. At trial, Turnipseed testified that he and Hammonds met specifically on one occasion to discuss a particular piece of Hammonds's property known as the "Otto Moorer Place," which had been on the market since 1991 or 1992. According to Turnipseed, Hammonds stated that he would pay Turnipseed a 10% commission if Turnipseed would produce a buyer for "x" price, under terms and conditions acceptable to Hammonds. Turnipseed could not remember the stated price, and Hammonds denied making the statement. In any event, both parties testified that commissions were usually negotiable.
Turnipseed attempted for several years to find a buyer for the property. In December 1994 Turnipseed showed the property to Dr. George Stacy, who made several offers on the property. It is undisputed that Turnipseed introduced Stacy and Hammonds for the first time and that Turnipseed expended a great deal of time in attempting to negotiate a sale.
On December 14, 1994, Turnipseed presented Stacy's first proposal, which included an offer to purchase 2,352 acres for a total purchase price of $764,400. The principal terms of the offer indicated that the sale would be subject to (1) the approval of existing timber contracts, (2) the removal of underground fuel tanks, (3) the inclusion of a tractor and a cutter, (4) the termination of all hunting leases, (5) the payment of part cash and part financing, (6) the inclusion of a house for an additional $30,000, and (7) the payment of a 10% commission to Turnipseed by Hammonds. The price per acre, excluding *Page 41 
the cost of the house, was approximately $312.
Hammonds rejected the offer. The facts are disputed whether Hammonds made a counteroffer to Stacy's first offer. Turnipseed, however, testified that he and Hammonds discussed Stacy's offer over the telephone and that Turnipseed made several changes on the document/proposal per Hammonds's instructions. According to Turnipseed, Hammonds made a counteroffer to sell 1,630 acres for a total purchase price of $604,100 (approximately $370 per acre).
Furthermore, Turnipseed testified that Hammonds agreed to the condition regarding the inclusion of the house, but that he deleted the cost of the house. We would note that the record is unclear regarding the terms of the house. Hammonds also agreed to the conditions regarding the termination of the hunting leases and the approval of the existing timber contracts. Turnipseed further stated that Hammonds disagreed with the conditions regarding the removal of the underground fuel tanks, the inclusion of the tractor and the cutter, and the 10% commission provision. Turnipseed testified that he deleted those conditions and changed the real estate provision to read "as agreed." Turnipseed testified that he presented the proposed changes to Stacy, who rejected them.
On December 16, 1994, Turnipseed presented Stacy's second proposal, which included an offer to purchase approximately 1,600 acres for a total purchase price of $575,000 (approximately $359 per acre). Hammonds did not respond to this offer. The negotiation process, however, continued.
On January 6, 1995, Turnipseed submitted Stacy's third proposal, which included an offer to purchase 1,630 acres for $604,100 (approximately $370 per acre). We would note that this offer was exactly the same as Hammonds's "alleged" counteroffer to Stacy's December 14, 1994, offer — the terms and conditions of the offer were the only differences.
It is undisputed that Hammonds did make a counteroffer to Stacy's January 6, 1995, offer. The counteroffer proposed to sell 1,630 acres for $650,000 (approximately $398 per acre). Hammonds, among other things, changed the commission provision to provide that the purchaser, and not the seller, would pay the commission. Stacy rejected the counteroffer and requested a return of his earnest money.
In the summer of 1995 Turnipseed contacted Hammonds, seeking permission to show the property to another prospective buyer. Hammonds informed Turnipseed that the property had been sold, but did not reveal the fact that it had been sold to Stacy. Subsequent to the closing, which occurred on August 4, 1995, Turnipseed learned that Hammonds had sold the property to Stacy and that the title to the property was placed in the name of a partnership that Stacy had formed. Turnipseed, at that point, requested his commission. According to Turnipseed, Hammonds responded that six months had expired and that he did not owe Turnipseed a commission. Hammonds did not deny making this statement.
As noted previously, Turnipseed sued Hammonds, and the trial court submitted the case to the jury on the sole issue of promissory fraud. Our supreme court, in Pinyan v. CommunityBank, 644 So.2d 919, 923 (Ala. 1994), stated the following well-settled law regarding promissory fraud:
 "In order to establish promissory fraud, a plaintiff must show: (1) a false representation; (2) of an existing material fact; (3) that is justifiably relied upon; (4) damage resulting as a proximate cause, and that, (5) at the time of the misrepresentation, the defendant had the intention not to perform the promised act and (6) that the defendant had an intent to deceive."
Furthermore, "[i]n promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it."Spring Hill Lighting Supply Co. v. Square D Co.,662 So.2d 1141, 1149 (Ala. 1995).
Thus, the fact that was allegedly misrepresented in this case was Hammonds's promise either to negotiate a commission or to pay a commission when, in fact, he did not intend to do so. After viewing the evidence *Page 42 
in a light most favorable to Turnipseed, we conclude that the jury could have found from the evidence presented that Hammonds never intended to negotiate a commission with Turnipseed or to pay Turnipseed a commission.
The record reveals that since 1987, Hammonds has entered into only four exclusive listing contracts with real estate brokers. As a result of those exclusive listing agreements, he actually sold two pieces of property that resulted in commissions. The first commission resulted from the sale of Hammonds's personal residence. The second commission resulted from a small sale by Turnipseed. The following testimony was elicited from Hammonds at trial:
 "Q. All right . . . . have you dealt with other brokers with regard to the attempts to sell property?
"A. Yes.
"Q. Approximately how many?
". . . .
"A. About ten.
 "Q. All right. And what sort of arrangement did you have with those brokers in order for them to help you sell the property if you didn't have an exclusive listing agreement with them?
". . . .
 "A. Basically they would come by my office and want permission to show a place.
". . . .
 "Q. Okay. Now, of those eight or ten brokers that you did not have exclusive listing contracts with how many of those have brought you deals that you actually sold and paid them a commission?
 "A. Well, I have had several that brought me contracts but I did not accept them other than Mr. Turnipseed.
 "Q. So the answer is none other than Mr. Turnipseed?
"A. I can't recall any that I closed.
 "Q. Okay. So on the roughly 130 tracts of property you sold in Lowndes County since 1987, other than the ones you identified with exclusive listing contracts, you have not closed on anything other than Mr. Turnipseed's deal where a broker brought you a prospect?
". . . .
 "Q. Okay. But isn't it a fact over that period of time these brokers have shown a lot of your property to lots of people?
"A. That's correct.
"Q. Okay. And stirred up a lot of interest?
"A. I guess it did. I don't know.
". . . .
 "Q. Okay, But, Mr. Hammonds, if you simply gave people permission to show and you knew they expected to be paid a commission if you sold the property to their prospect, how would they know what [terms and conditions] would be acceptable to you?
 "A. I don't guess they would know until I accepted it.
 "Q. So you would hold the trump card down at the end, you could either say yes or no?
"A. Well, they were the ones asking me."
In essence, Hammonds's testimony suggests that although he used brokers over the years to show his property, only two brokers received commissions. It would obviously appear that Hammonds did not put the terms and the conditions of a prospective sale in writing because he wanted to control the outcome of the deal, i.e., he did not want to pay a commission. While this evidence may appear merely circumstantial, it is, nevertheless, relevant to Hammonds's intent in this case.
It is well settled that circumstantial evidence may be used to prove fraudulent intent. The evidence, however, "must be of such quality that 'the jury, as reasonable persons, may fairly and reasonably infer the ultimate fact to be proved.' "Pinyan, 644 So.2d at 924 (quoting Marshall Durbin Farms, Inc.v. Landers, 470 So.2d 1098, 1101 (Ala. 1985)).
We would also add that when Turnipseed requested his commission, Hammonds responded that six months had expired and that he did not owe Turnipseed *Page 43 
anything. Hammonds did not deny making the statement. In fact, Turnipseed stated that Stacy's son also made the same statement. As noted previously, Turnipseed presented Stacy's third and final offer to Hammonds on January 6, 1995. Thereafter, in the summer of 1995 Hammonds and Stacy entered into separate negotiations. Hammonds sold the property to Stacy, and the deal closed on August 4, 1995. It would appear that Hammonds, in believing that he did not owe Turnipseed a commission, relied on the law regarding exclusive listing contracts and extension clauses, which basically states the following:
 "In cases where the owner sells to his agent's client pending the agency, and in cases of any fraudulent device to evade commissions, and still reap the fruits of his labors, the fact that the owner does sell to such client is sufficient evidence that he was ready, able, and willing to purchase.
 "But a sale by the owner after the expiration of the time limit [i.e., six months] is not subject to this rule."
Gulf Trading Co. v. Radcliff, 216 Ala. 645, 655, 114 So. 308,317 (1927) (citations omitted). We reiterate that this rule of law applies to exclusive listing contracts and that Hammonds and Turnipseed did not have an exclusive listing contract. Clearly, the jury could have inferred that Hammonds's response regarding the expiration of the six-month time period evidenced his intent not to pay a commission.
Finally, Turnipseed notes that the terms and conditions contained in Stacy's third proposal are somewhat similar to the terms and conditions contained in the sales agreement. As stated previously, Stacy's third proposal included an offer to purchase 1,630 acres for a total purchase price of $604,100 (approximately $370 per acre). The sales agreement between Stacy and Hammonds indicates that Hammonds agreed to sell Stacy 1,630 acres and that "[i]f the acreage certification is 20 acres more or less than 1,630 acres, then the purchase price will be adjusted up or down based on $390 per acre." Turnipseed contends that these numbers are very close. Turnipseed also notes that Hammonds ultimately agreed to almost all of Stacy's conditions, the same conditions that Hammonds had rejected in previous proposals.
Hence, a jury could have inferred that Hammonds used Turnipseed to produce Stacy as a buyer; that Hammonds repeatedly declined the terms and conditions that Stacy presented, but later accepted the majority of them in the final contract; that Hammonds made several changes to the real estate provisions regarding the commission; and that Hammonds, and probably Stacy, waited until six months had passed to close the deal, under the belief that they both could avoid paying a real estate commission.
Hammonds finally contends that the jury disregarded the trial court's instructions and awarded damages based upon a claim for breach of contract. Specifically, the trial judge instructed the members of the jury that they could not consider the issue of a commission because the trial court had already dismissed Turnipseed's contract claims. The jury, in any event, returned a verdict for 10% of the purchase price.
It is well settled that "[t]he purpose of damages [in a fraud case] is to place the defrauded person in the position he would occupy if the representations had been true." Wilhoite v.Franklin, 570 So.2d 1236, 1237 (Ala.Civ.App. 1990). Thus, the dispositive issue in this regard is whether the jury's award was proper under the circumstances.
In the instant case the jury apparently found that Hammonds represented that he would pay a real estate commission when, in fact, he had no intention of doing so. Thus, the jury, in awarding Turnipseed 10% of the purchase price, placed Turnipseed in the position that he would have occupied had the representation been true. Thus, the jury's award in this case seems to be the most appropriate remedy. Furthermore, the amount of the commission was supported by the evidence. The evidence reveals that 10% is the usual starting point for real estate commissions on land sales, because land sales take longer to negotiate and to close.
Based on the foregoing, we conclude that the jury's assessment of damages in this case was not based on speculation or conjecture and that the jury apparently did what it *Page 44 
thought proper to make Turnipseed, the defrauded person, whole again.
Consequently, the judgment based on the jury verdict is due to be affirmed.
The foregoing opinion was prepared by Retired Appellate Judge Richard L. Holmes while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975.
AFFIRMED.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.
CRAWLEY, J., concurs in the result.