Alabama Municipal and Environmental Engineers, Inc. ("AME"), appeals from a judgment of the Baldwin Circuit Court in favor of Slaughter Construction Company, Inc. ("Slaughter"), following a bench trial. We reverse.
Pursuant to Ala. Code 1975, Title 39, the Utilities Board of the City of Bay Minette ("the Board") solicited bids for a one-year contract for the rehabilitation of existing manholes ("the contract").[1] The Board hired AME to prepare the specifications for the contract ("the contract specifications"), and to gather, rank, and forward bids to the Board, along with a recommendation as to which company submitting a bid should be awarded the contract. The ultimate decision regarding which company should receive the contract rested solely with the Board.
The contract specifications did not call for the rehabilitation of a specific number of manholes; instead, the contract specifications allowed for the Board to determine if and when manholes required rehabilitation. The contract specifications allowed the contract period to be extended to up to three years from the bid date. The contract specifications called for the rehabilitation of manholes using a cementitious process, an epoxy process, or a fiberglass process, with the Board making the decision as to the process to be used on a manhole-by-manhole basis, after the award of the contract. Thus, the contract specifications required that companies submitting bids be able to work with all three types of materials, and the bids submitted had to include costs for all three.
Section 12 of the contract specifications concerned the rehabilitation of manholes using the epoxy process. Section 12.02 provided:
 "12.02 QUALITY ASSURANCE
 ". . . .
 "C. The manhole rehabilitation contractor shall provide evidence and preferences for having successfully installed resin based liners in at least 750 manholes and must have *Page 891 
at least five (5) years experience in using the products specified in this specification. The product must also have been installed in at least 10,000 manholes during the last ten (10) years and have had at least 3000 manholes successfully installed for a period of five (5) years or longer. Certification of compliance with these requirements shall be included with the bid proposal."
On May 25, 2004, the day bids were due, AME received three bids. Staggs Environmental Construction ("Staggs") submitted a bid in the amount of $82,464; Slaughter submitted a bid in the amount of $89,200.04; and Suncoast Infrastructures, Inc., submitted a bid in the amount of $107,749.
On May 27, 2004, Slaughter sent a letter of protest to AME in which it complained that Staggs's bid did not comply with the contract specifications. Slaughter's letter stated:
 "We write in regard to the bids which were received on the above referenced project in Bay Minette, AL on May 25th, 2004.
 "Paragraph 12.02.C of the contract specifications which is under the heading of Manhole and Wet Well Rehabilitation (Epoxy/Resin Based) states as follows `The manhole rehabilitation contractor shall provide evidence and references for having successfully installed resin based liners in at least 750 manholes and must have at least five (5) years experience in using the products specified in this specification. The product must also have been installed in at least 10,000 manholes during the last ten (10) years and have had at least 3000 manholes successfully installed for a period of five (5) years or longer. Certification of compliance with these requirements shall be included with the bid proposal (emphasis added)'.
 "Staggs Environmental Construction, Inc. (Staggs) submitted in its bid a certification letter written by Stephen's Technologies, Inc. (Stephens) which is somewhat vague and confusing as to whether Stephens actually meets the manufacturers product requirements of 10,000 manholes installed during the last ten (10) years. Stephens clearly indicates though in it's letter (and also Staggs by submitting the letter) that Staggs as the rehabilitation contractor does not meet the performance requirement of having installed liners in 750 manholes and five (5) years of experience as an applicator of the epoxy products.
 "Staggs bid is therefore non-responsive because:
 "1.)Staggs clearly will not be able to provide evidence and references for having successfully installed resin based liners in at least 750 manholes and having at least five (5) years experience. No other conclusion can be reached from Stagg's attempt via Stephen's letter to circumvent the experience requirements by substituting the presence of a factory supplied representative in lieu of the actual experience required of Staggs under the project specifications.
 "2.) The Stephen's letter is inadequate as a certification of compliance of meeting the requirements of the bid specifications. It is vague in its declarations and doesn't specifically address meeting the requirements of paragraph 12.02C.
 "The bid submitted by our firm, Slaughter Construction Company, Inc. includes a certification clearly referencing paragraph 12.02.C and certifies unambiguously *Page 892 
that our product, SprayWall has been installed in at least 10,000 manholes during the last ten (10) years and has been installed in at least 3000 manholes during the last five (5) years. Additionally we stand ready as the contractor to provide evidence that we have successfully installed resin based liners in at least 750 manholes and that we have at least five (5) years experience in using the product as is required by specification paragraph 12.02C.
 "The bid documents state that `The award of the Contract, if it be awarded, will be by the Owner to the lowest responsible Bidder whose Proposal shall comply with all the requirements necessary to render it formal.' Stagg's bid contains material deficiencies which are not informalities which can or should be waived. It is clearly non-responsive. The bid by our firm does comply in every aspect with the requirements of the bid and we request that we be awarded the contract as the lowest responsible bidder on this bid."
AME was not satisfied with the certification letter that Staggs submitted with its bid. AME undertook to determine whether Staggs did, in fact, possess the experience with epoxy-based liners for which the contract specifications called, as well as to obtain information on the epoxy product Staggs intended to use if awarded the contract. AME became satisfied that Staggs met the experience requirements of section 12.02C after reviewing a letter from Staggs dated June 22, 2004, indicating that it would use a subcontractor for the epoxy-based liners that met the experience requirements of section 12.02C. AME became satisfied that Staggs met the product requirements of section 12.02C after it became aware that Staggs would be using an epoxy that was manufactured by New Life Coatings.
Thereafter, AME sent the bid materials to the Board and recommended to the Board that it award the contract to Staggs as the lowest responsible bidder. The Board, after reviewing AME's recommendations, met on June 28, 2004, and decided to award the contract to Staggs. A representative of Slaughter appeared at the Board's August meeting to express its objections to the awarding of the contract to Staggs. The contract with Staggs was executed on August 20, 2004.
On November 10, 2004, Slaughter sued AME. Slaughter alleged that AME had improperly recommended Staggs as the lowest responsible bidder to the Board, in spite of the fact that Staggs's bid did not comply with the contract specifications. Pursuing a tort claim, Slaughter alleged that it had been damaged as a proximate result of its reliance on AME's representations and its contract specifications, and by AME's failure to follow the contract specifications that it had prepared when it recommended Staggs as the lowest responsible bidder.[2] Slaughter claimed damages based on lost profits, bid-preparation expenses, and the cost of litigation.
The trial court held a bench trial on July 6, 2005. At trial, Slaughter submitted an exhibit that set forth the bases of the compensatory damages it sought. Through that exhibit, Slaughter argued that it was entitled to $11,630 for lost profits, $4,662.50 in bid-preparation expenses, *Page 893 
$80 for the purchase of the bid documents, and $180 in travel expenses. AME objected to the exhibit because, it argued, lost-profit damages are too speculative to be awarded and neither lost profits nor bid-preparation expenses are recoverable in actions brought under the Competitive Bid Law. The trial court overruled AME's objection.
Bobby Slaughter, Slaughter's president and owner, testified that Slaughter relied on the contract specifications that AME prepared and adhered to the requirements of the contract specifications. He testified that, had it not done so, it could have submitted a lower bid. He also testified that, had AME enforced all of the requirements of the contract specifications, Slaughter would have been awarded the contract, unless the Board decided to reject all of the bids.
After Slaughter rested its case, AME moved for a judgment as a matter of law, arguing that Slaughter could not pursue a tort claim against it because the only relief allowed under the Competitive Bid Law is an injunction prohibiting the execution of a contract that is awarded in violation of the Competitive Bid Law. Slaughter responded that its action was brought pursuant to the tort of fraud, and that, under Alabama Supreme Court precedent, such an action is allowed in circumstances such as those presented in this case. Thus, it argued, its action was not barred by the fact that the Competitive Bid Law provides only for an injunctive remedy. This trial court denied AME's motion.
Greg Thompson, one of AME's employees, testified at trial on AME's behalf. He indicated that, when drafting the contract specifications, AME knew that prospective bidders would rely on the contract specifications when preparing their bids. He admitted that the language of section 12.02C of the contract specifications was mandatory and that he had not been satisfied by the certification letter that Staggs submitted with its bid pursuant to that section. He also admitted that the New Life Coatings epoxy material that Staggs intended to use in performing the contract did not meet two of the physical requirements listed in the contract specifications and was not an approved product under the contract specifications. Although the contract specifications provided a process by which a bidder could obtain approval to use an alternative product before submission of its bid, Staggs did not follow that process to obtain approval for the epoxy material it intended to use.
AME renewed its motion for a judgment as a matter of law at the close of the evidence, stating the same basis as its previous motion for a judgment as a matter of law. The trial court denied AME's motion.
On August 18, 2005, the trial court entered a judgment in Slaughter's favor, awarding it $3,071.25 in compensatory damages and $2,000 in attorney fees. The trial court did not set forth any findings of fact in its order. AME appeals.
AME argues that Ala. Code 1975, § 39-5-4, prescribes the sole remedies available to an unsuccessful bidder under the Competitive Bid Law, and that, except as allowed by § 39-5-4, an unsuccessful bidder cannot pursue a claim for money damages. We agree.
Section 39-5-4 states as follows:
 "The Attorney General, a bona fide unsuccessful or disqualified bidder, or any interested citizen may maintain an action to enjoin the letting or execution of any public works contract in violation of or contrary to the provisions of this title or any other statute and may enjoin payment of any public funds under any such contract. In the case of a successful *Page 894 
action brought by a bidder, reasonable bid preparation costs shall be recoverable by that bidder. The action shall be commenced within 45 days of the contract award."
"The purpose of statutory or charter provisions requiring municipal corporations to let contracts on competitive bidding after notice, is to secure economy and protect the citizens and taxpayers of the municipality from fraudulent favoritism in letting such contracts." Carson Cadillac Corporation v. Cityof Birmingham, 232 Ala. 312, 316, 167 So. 794, 798 (1936) (internal quotation marks and citations omitted). Thus, "[t]he Competitive Bid Law was enacted for the benefit of thepublic, not for the benefit of the unsuccessful bidder," TFT,Inc. v. Warning Systems, Inc., 751 So.2d 1238, 1247
(Ala. 1999) (emphasis added), and it "does not confer on a bidder any right enforceable at law or in equity," Townsend v.McCall, 262 Ala. 554, 558, 80 So.2d 262, 265 (1955).
In keeping with the Competitive Bid Law's purpose, the remedy available to disappointed bidders is one that vindicates the public interest in protecting the public coffers, not one that is focused on the vindication of private interests and the interests of disappointed bidders. In Jenkins, Weber and Associates v.Hewitt, 565 So.2d 616, (Ala. 1990), the plaintiff company was the second lowest bidder on a contract for the sale and installation of a computer processing system. The contract, however, was awarded to the fourth lowest bidder. The plaintiff company and two individuals brought an action, purportedly under the Competitive Bid Law, seeking monetary relief.[3] On appeal, following the entry of a summary judgment against the plaintiffs, our Supreme Court held that the Competitive Bid Law does not provide for the remedy that the plaintiffs sought:
 "[The plaintiffs'] complaint, as amended three times, did not seek injunctive relief pursuant to § 41-16-31, but rather claimed monetary damages.
 "We find nothing in the legislative history of § 41-16-31 nor in the cases interpreting that statute that allows an unsuccessful bidder to sue for monetary damages. In Urban Sanitation Corp. v. City of Pell City, 662 F.Supp. 1041, 1044 (N.D.Ala.1986), a federal district court interpreting that statute stated:
 "`There is no indication in this statute, however, that an unsuccessful bidder has any right or expectancy to insist upon the award of a contract. To the contrary, the statute is carefully crafted to limit the remedy to "enjoin[ing] execution of any contract entered into in violation of the provisions of this article." When the statute is unambiguous, its expressed intent *Page 895 
must be given effect and there is no room for construction.'
 "(Citation omitted.)"
Jenkins, Weber and Associates, 565 So.2d at 617-18
(footnote omitted).
In the present case, as in Jenkins, the underlying basis of Slaughter's cause of action against AME is Slaughter's contention that it was the lowest responsible bidder and that it, rather than Staggs, should have been awarded the contract by the Board. Although Slaughter couches its cause of action as sounding in tort rather than as a violation of the Competitive Bid Law, the gravamen of its argument rests firmly on the Competitive Bid Law's requirement that certain public contracts, such as the one at issue in this case, be awarded only to the lowest responsible bidder.
For this reason, we find that the Competitive Bid Law governs Slaughter's cause of action in the present case against AME. As a disappointed bidder that believed the contract at issue in this case should not have been awarded to Staggs, Slaughter's statutorily-prescribed remedies were to "maintain an action to enjoin the letting or execution" of the contract and, if successful in obtaining that injunction, to seek an award of its bid-preparation costs.
Spring Hill Lighting Supply Co. v. Square D Co.,662 So.2d 1141 (Ala. 1995), upon which Slaughter relies, is distinguishable. In Spring Hill the plaintiff was a parts supplier that had agreed to supply an electrical substation to a subcontractor of the successful bidder on a large project for the Alabama State Docks Department. Spring Hill,662 So.2d at 1143. After several individuals and entities, including an employee of the Alabama State Docks Department, allegedly caused the subcontractor to cancel its order with the plaintiff, the plaintiff sued the individuals and entities for money damages, alleging tort claims for fraud, intentional interference with business relations, and conspiracy. Id. at 1143-45. The trial court entered a summary judgment in favor of the defendants, finding that the Competitive Bid Law did not allow causes of action seeking money damages. Id. On appeal, our Supreme Court reversed, holding that the plaintiff parts supplier was entitled to pursue intentional tort claims against the defendants. Id. at 1147-51.
The plaintiff in Spring Hill was not a disappointed bidder and its cause of action did not arise from an alleged circumvention of the competitive bidding process. In the present case, however, Slaughter is a disappointed bidder, and its cause of action does derive from an alleged circumvention of the competitive bidding process.
If our holding today were to be otherwise that it is, the limitation of remedies prescribed by the Competitive Bid Law, could, and, no doubt regularly would be, circumvented through the use of allegations by disappointed bidders that decisions by bidding authorities and/or their agents in violation of the Competitive Bid Law amounted to intentional tortious conduct. When the gravamen of the offense is a violation of the bid law, the limitation of remedies imposed by statute must be applicable regardless of whether the disappointed bidder uses evidence of the violation to contend that the bidding authority decided to act in violation of the Competitive Bid Law in advance (i.e., before or during the solicitation of bids, as is alleged here) or after the receipt and opening of bids.
Because we conclude that Slaughter's action was governed by the Competitive Bid Law and that its remedy was limited to filing an action seeking to enjoin the awarding of the contract at issue to Staggs *Page 896 
(and, if successful, to recover its bid preparation expenses), we reverse the judgment of the trial court and remand the cause for the entry of a judgment consistent with this opinion.[4]
REVERSED AND REMANDED.
PITTMAN and BRYAN, JJ., concur.
CRAWLEY, P.J., and THOMPSON, J., concur in the result, without writing.
[1] Because the contract for which the Utility Board sought bids was for a "public work" as defined by Ala. Code 1975, §39-2-1(5), the bidding process was controlled by Title 39 of the Code of Alabama 1975. See Ala. Code 1975, §§ 39-1-5,41-16-50(a). Title 39, combined with § 41-16-20 et seq., shall hereinafter be referred to as "the Competitive Bid Law".
[2] Although the complaint does not delineate the species of tort alleged, both parties, in their appellate briefs, agree that, through its complaint, Slaughter sought recovery on the basis of the tort of fraudulent misrepresentation. Both parties agree that the theory of Slaughter's cause of action was that AME misrepresented in its contract specifications that bidders' certifications of the quality-assurance criteria set forth in section 12.02 of the contract specifications were required to be submitted with each bid.
[3] The portion of the Competitive Bid Law at issue inJenkins, Weber Associates is found in Chapter 16 of Title 41, which deals with public contracts other than those dealt with in Title 39, which is applicable to the present case. The remedial provisions in Title 41 (§ 41-16-31 and §41-16-61) are identical to one another and are substantially similar to the remedial provision applicable to the present case, § 39-5-4. Sections 41-16-31 and 41-16-61 state:
 "Any taxpayer of the area within the jurisdiction of the awarding authority and any bona fide unsuccessful bidder on a particular contract shall be empowered to bring a civil action in the appropriate court to enjoin execution of any contract entered into in violation of the provisions of this article."
The one notable difference in §§ 41-16-31 and 41-16-61, on the one hand, and § 39-5-4, on the other, is that the latter specifically allows for recovery of limited monetary damages in the form of "bid preparation costs" if the plaintiff is successful in obtaining injunctive relief.
[4] Because we resolve this appeal in this manner, we do not reach AME's other contentions.