MADDOX, Justice.
The question presented by this petition for the writ of mandamus is whether the defendants in a lawsuit pending in the Montgomery Circuit Court — the Alabama Department of Transportation (“ALDOT”) and several of its officers and employees— are immune from liability under the provisions of Art. I, § 14, of the Constitution of' Alabama 1901.
In the petition, ALDOT and its officers and employees ask us to direct the trial court to grant their collective motions for summary judgment based on their claims of sovereign immunity. After considering the briefs of the parties, we grant the writ of mandamus.
I.
This lawsuit, filed by Blue Ridge Sand and Gravel, Inc., and its owner, Bob Estes (hereinafter both are usually referred to as “Blue Ridge”), arose out of ALDOT’s amendment of standards and specifications [1] pertaining to the use of gravel in hot-asphalt mixes for roads and bridge superstructures. These amended specifications require that mixes used for these purposes contain gravel having a bulk specific gravity greater than 2.550. The amendments made Blue Ridge’s gravel, called “chert,” unsuitable because it has a bulk specific gravity less than that set by the amended specifications. Documents filed in support of the mandamus petition show that ALDOT adopted the new specifications after testing of road surfaces revealed a series of problems with roads constructed with materials permitted by the old specifications. It is undisputed that ALDOT’s adoption of new specifications adversely affected the market for chert gravel and thereby caused Blue Ridge to sustain large losses.
Blue Ridge sued ALDOT and the named officers and employees, alleging intentional *1266 interference with a business or contractual relationship; intentional misrepresentation; suppression; and civil conspiracy.
Because this petition arises out of the trial court’s denial of the defendants’ motions for summary judgment, our review is guided by Rule 56, Ala. R. Civ. P. Under that rule, a party moving for a summary judgment is entitled to such a judgment if that party meets the following two-tiered standard: 1) There must be no genuine issue of material fact and 2) the movant must be entitled to a judgment as a matter of law. Rule 56(c); Carpenter v. Davis, 688 So.2d 256, 258 (Ala.1997). Furthermore, this Court must view all the evidence in a light most favorable to the nonmovant and must resolve all reasonable questions from the evidence in favor of the nonmovant. Fincher v. Robinson Bros. Lincoln-Mercury, Inc., 583 So.2d 256 (Ala.1991); see Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).
The movant must make a prima facie showing that there are no genuine issues of material fact and that he is entitled to a judgment as a matter of law. Fincher, 583 So.2d at 257. If the movant makes this showing, the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by presenting “substantial evidence” creating a genuine issue of material fact. Id. “Substantial evidence” is “evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co., 547 So.2d 870, 871 (Ala.1989).
II.
ALDOT’s petition indicates that ALDOT and the Federal Highway Administration (“FHWA”) generally oversee the construction and maintenance of Alabama’s roads. ALDOT, which uses Federal highway funds, must comply with Federal regulations regarding the design and construction of roadways. The FHWA manages the disbursement of these funds and is responsible for ensuring that State agencies using them comply with Federal law and regulations. See generally, Title 23, U.S.C., and Title 23, C.F.R. Federal regulations dictate that states design and employ pavements that will accommodate predicted traffic flows in a safe and economical manner. In furtherance of this policy, the FHWA requires State highway authorities, including ALDOT, to conduct skid tests on various road surfaces and to submit the results for review. These skid tests measure the friction between a tire and the road surface and aid in identifying roadways that may be unsafe.
During the 1980s, skid tests performed on an assortment of Alabama’s roads revealed that many of the surfaces were unsafe and had deteriorated more rapidly than expected. ALDOT investigated these roads and discovered that their surfaces had been repaved with asphalt containing chert gravel as the coarse aggregate. At the time these roads were repaved, AL-DOT’s specifications required only that coarse aggregates have a maximum moisture absorption level of 5%. ALDOT launched further investigations to determine why projects meeting specifications had failed.
In June 1993, Dr. Frazier Parker, Jr., of the Highway Research Center at Auburn University, conducted a study of asphalt surfaces and tested the endurance and performance of potential mixes. His report concluded that stripping, a phenomenon that occurs when the asphalt separates from the coarse aggregate, resulted from the presence of water in the asphalt mix; the water caused the aggregate and the asphalt to lose adhesion.
In 1994, ALDOT first started to consider imposing a minimum bulk specific gravity of 2.550 on coarse aggregate by implementing such a requirement on individual contracts not pertaining to city or county road-construction projects. Blue Ridge did not oppose the implementation of the *1267 individual restrictions, because of the volume of business it enjoyed with projects that were not covered by the restriction. Nevertheless, ALDOT continued to research the use of chert gravel in hot-mix asphalt. It formed the Chert Study Task Force in May 1994 to study the use of chert gravel and its possible moisture retention in road surfaces. In December of that year, the Task Force issued its report, concluding that Alabama road surfaces prematurely deteriorated because of internal moisture, which is an inherent characteristic of chert gravel. Consequently, ALDOT began to study the formulation and adoption of new specifications to eliminate the moisture problem. In April 1995, the Materials and Tests Bureau, a division within ALDOT, recommended the promulgation of a new specification for a more stringent gravel-absorption level of 2%. ALDOT adopted this new specification in May 1996, after obtaining the approval of the FHWA.
In March 1996, Bob Estes, the owner of Blue Ridge, learned that ALDOT had been considering expanding the implementation of the 2.550 bulk-specific-gravity minimum requirement to all Department road projects. Estes became concerned about the implications of this proposed rule, because Blue Ridge derived most of its revenue from its subcontracts with road-construction companies that had contracted with ALDOT to build roads.[2] Estes was concerned that the blanket implementation of the new bulk-specific-gravity requirement would destroy the market for chert gravel and would thereby drive Blue Ridge out of business. After hearing that ALDOT specifications might change, Estes immediately requested a meeting with ALDOT officials, including each of the individual defendants. He says he asked for the reasons behind the possible change in the specifications and was told that the new specification was “picked out of the air to keep [chert] gravel out of roadways.” Estes told the officials that the requirement would be fatal to Blue Ridge’s business. Estes says that at the conclusion of the meeting, Jimmy Butts, the director of ALDOT, told him that ALDOT would continue to use chert gravel for road projects scheduled for the upcoming 1997 bidding season if Blue Ridge crushed its chert gravel to a certain size.
After the meeting, ALDOT published its “Approved Source List,” which contained an amendment allowing Blue Ridge to supply chert gravel for use in hot-mix asphalt if it was crushed to the specified size. This list went unchanged for 10 months after Estes had met with ALDOT officials. Estes says that he believed ALDOT would continue to allow the use of chert gravel and that, based on that belief, Blue Ridge borrowed and spent $1.2 million to prepare to meet its potential obligations to construction companies that normally contracted with Blue Ridge for aggregate material. Meanwhile, ALDOT continued with its research regarding pavement failures involving chert gravel, but also continued with its plans for that year for road construction using the 2% moisture-standard specification promulgated in 1996.
ALDOT began a resurfacing project on U.S. Highway 72 in August 1996, using in that project chert gravel meeting the 2% moisture standard. This material was supplied by Blue Ridge. Six months after the project was completed, James Brown, an ALDOT engineer, noticed failures in the road surface. ALDOT, at substantial cost, removed and replaced the materials that had caused the failure.
After ALDOT had discovered the failures in the Highway 72 project, several ALDOT employees, including Larry Lock-ett, Ray Bass, James Brown, Norris Killen (all of whom Blue Ridge named as defendants in its lawsuit), and two others not named in this action, toured North Ala *1268 bama highway projects. After they hade made that tour, ALDOT, in March 1997, adopted new specifications that eliminated chert gravel from hot-asphalt mixes on State highway projects; it did so on the recommendations of Bass, Lockett, and Butts. These men based their recommendations on observations and extensive research conducted by other individual defendants, who were employed by ALDOT at that time. The new specifications adopted the previously considered bulk-specific-gravity requirement of 2.550; the adoption of this new standard effectively excluded chert gravel. Overall, seven suppliers of gravel, in addition to Blue Ridge, were affected by that decision.
III.
This Court normally will not review, on a mandamus petition, issues raised by a summary-judgment motion. However, this Court has made exceptions to that rule for cases involving questions of sovereign immunity, as this case does. See Ex parte Purvis, 689 So.2d 794, 795 (Ala.1996); see also Ex parte Davis, 721 So.2d 685, 689 (Ala.1998). “Mandamus is an extraordinary remedy that will not be granted absent a clear showing of a right to relief.” Ex parte Sekeres, 646 So.2d 640, 642 (Ala.1994). Blue Ridge concedes that the individual defendants were engaged in the performance of discretionary duties. Consequently, the issue before us turns on the sufficiency of Blue Ridge’s efforts to assert claims that fall under the “intentional-acts” exception to the grant of immunity. On public-policy grounds, we have been willing to provide interlocutory review, on a mandamus petition, in a case where the trial court denied a summary-judgment motion based on a defendant’s claim of discretionary-function immunity. The same public-policy considerations apply here as well. If we did not provide that review, then the defense of immunity would be incomplete; a trial and appeal would be necessary to sustain a defendant’s immunity.
The immunity claimed by ALDOT and the other defendants is derived from Article I, § 14, of the Alabama Constitution of 1901, which states “[t]hat the State of Alabama shall never be made a defendant in any court of law or equity.” Under this section, “[t]he State and its agencies have absolute immunity from suit in any court.” Mitchell v. Davis, 598 So.2d 801, 806 (Ala.1992). ALDOT is clearly a State agency, and, as such, is immune from suit. See generally Ex parte Kelley, 739 So.2d 1095 (Ala.1999). Therefore, Blue Ridge’s claims against it are barred by the doctrine of sovereign immunity.
This doctrine also applies to State officers and employees, who enjoy immunity from an action filed against them in either their official or individual capacity if the action is, in substance, one against the State. Mitchell, 598 So.2d at 806. The immunity enjoyed by State officers and employees is not absolute, however, and, as we observed in Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989), the protective cloak of immunity sheltering these individuals from tort liability is not impenetrable. For example, § 14 sovereign immunity does not protect State officers and employees under circumstances where a plaintiff alleges that they acted “willfully, maliciously, illegally, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of the law,” Phillips, 555 So.2d at 83, nor does it protect them from “a suit to compel the performance of a legal duty, a suit to enjoin the enforcement of an unconstitutional law, a suit to compel performance of a ministerial act, or a suit brought under the Declaratory Judgments Act.” Mitchell, 598 So.2d at 806.
In order to claim the benefits of sovereign immunity, a State officer or employee bears the burden of showing that the plaintiffs claims arise from the officer or employee’s performance of a discretionary duty on behalf of the State. Ex parte Davis, 721 So.2d at 689. Upon such a *1269 showing, the burden shifts to the plaintiff, who must show that the officer or employee acted fraudulently, willfully, maliciously, or in bad faith. Id. As previously noted, Blue Ridge concedes that its claims arise from the defendants’ performance of discretionary duties; therefore, we will consider only the question whether there is a genuine issue of material fact as. to whether the officers and employees of ALDOT named as defendants engaged in fraudulent, willful, malicious, or bad-faith conduct regarding each of the three claims.
IV.
The four claims alleged by Blue Ridge include misrepresentation, suppression, intentional interference with a contract or business relationship, and civil conspiracy. We will address the claims in that order.
A.
The plaintiffs’ first claim is fraudulent misrepresentation. This cause of action involves four elements: “(1) a false representation (2) concerning a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result.” Baker v. Bennett, 603 So.2d 928, 935 (Ala.1992), overruled on other grounds by State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834 (Ala.1998). We have held that “ ‘[i]n order for promises or opinions to constitute fraudulent misrepresentations, there must have been at the time the representations were made an intention not to do the act promised, and such promise or opinion must have been given with intent to deceive.’ ” Army Aviation Ctr. Fed. Credit Union v. Poston, 460 So.2d 139, 143 (Ala.1984) (quoting Clanton v. Bains Oil Co., 417 So.2d 149, 151 (Ala.1982)).
Blue Ridge ultimately bases this claim on representations made by ALDOT personnel at the March 20, 1996, meeting. Specifically, it alleges that Jimmy Butts told Estes that ALDOT would not adopt a bulk-specific-gravity specification and that ALDOT would allow Blue Ridge to continue to supply State contractors with chert gravel for road construction projects for the upcoming year, provided it was crushed to a certain size. According to Estes’s deposition, these statements were made as part of a single conversation. Given the context of that conversation, the promise by ALDOT officials and employees to delay the implementation of the new specification clearly referred only to the upcoming year.
Blue Ridge did not produce substantial evidence suggesting that the alleged promises were made with the intention to deceive, or even that they were unfulfilled. Depositions and ALDOT internal memo-randa indicate that at the time of the meeting with Estes, ALDOT had not yet decided to implement a bulk-specific-gravity .requirement and that ALDOT was only considering such a requirement. The decision to implement the new specifications was not made until February 1997, nearly one year after Blue Ridge alleges the promise was made; therefore, the officers and employees of ALDOT were entitled to a summary judgment on the misrepresentation claim.
B.
Blue Ridge also alleged that, at the March 20,1996, meeting, the individual defendants fraudulently suppressed an intention to amend ALDOT specifications in order to exclude the use of chert gravel in State road construction. The undisputed evidence indicates, however, that at the time of the meeting the adoption of new specifications banning the use of chert gravel was still being considered. The only testing ALDOT had conducted at that time involved moisture limitations that allowed the use of chert gravel to continue, a fact demonstrated by Butts’s pledge regarding the continued use of chert gravel for that same year of road construction. The testing and studies conducted during the course of that year regarding chert demonstrate that ALDOT officials were deliberating whether to disallow the use of *1270 chert in State road-construction projects. When Estes met with ALDOT personnel, the defendants had not yet formed the previously mentioned intention that Estes and Blue Ridge argue they should have disclosed. Consequently, the defendants were entitled to a summary judgment on the suppression claim as well.
C.
Blue Ridge also claims that the defendants intentionally interfered with contractual and business relations when they amended ALDOT specifications to exclude chert gravel. The elements of this cause of action include: “(1) The existence of a contract or business relation; (2) defendant’s knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; and (4) damage to the plaintiff as a result of [the] defendant’s interference.” Lowder Realty, Inc. v. Odom, 495 So.2d 23, 25 (Ala.1986), overruled on other grounds by State Farm Fire & Cas. Co. v. Owen, 729 So.2d 834 (Ala.1998). Defining this cause of action to apply to a “business relation” as well as a “contractual relation” allows a plaintiff a remedy in the situation where a defendant has intentionally interfered with a prospective contract as well when he has interfered with an existing contract. See Restatement (Second) of Torts, § 766B cmt. b (1979). This rule has always been justified by the policy that “protection is appropriate against improper interference with reasonable expectancies of commercial relations even when an existing contract is lacking.” Restatement, § 766 cmt. c (1979).
The defendants argue that when ALDOT implemented the bulk-specific-gravity specification, Blue Ridge did not have a reasonable expectancy of the formation of a contract for it to supply gravel that would not have met the new requirement. We agree.
Blue Ridge’s contracts for supplying chert gravel depended on the needs of the general contractors with which it did business. The undisputed evidence suggests that, when ALDOT amended its specifications to effectively exclude the use of chert gravel on Alabama roads, the State had not awarded any road-construction contracts to any general contractor that had relied on Blue Ridge’s bid as a subcontractor. The evidence in support of the motions for summary judgment shows that, typically, if the State awards a contract to a general contractor that has not relied on a bid by Blue Ridge, then that general contractor would not need Blue Ridge to supply materials. Consequently, the rise and fall of Blue Ridge’s fortunes as a subcontractor correlate with those of its typical general contractors as they compete for State road-construction projects. As a subcontractor, Blue Ridge could not reasonably have expected that its chert gravel would have been needed by a general contractor that had not yet been awarded the primary contract, even if that contractor had prior business with the State.
Blue Ridge relies on Spring Hill Lighting & Supply Co. v. Square D Co., 662 So.2d 1141 (Ala.1995), to support the trial court’s denial of a summary judgment. That case is distinguishable from this present case. In that case, Spring Hill was a supplier of electrical equipment; it sued an employee of the Alabama State Docks and other defendants, alleging intentional interference with business relations because of the adoption of certain specifications that destroyed the eligibility of all subcontractors except one. Admittedly, this Court reversed the defendants’ summary judgment in that case,[3] but the critical difference between that case and this one is the maturity of the business relationship. In the Spring Hill case, the Alabama State Docks had already accepted the general contractor’s bid, which incorporated Spring Hill’s bid, when the alleged *1271 interference occurred. Id. at 1148. As a result, Spring Hill had a legitimate expectancy of the formation of a contract before the alleged tortious act occurred. Therefore, the Spring Hill case is inapposite. The defendants were entitled to a summary judgment on Blue Ridge’s claim alleging tortious interference with a business or contractual relationship.
D.
The final claim alleged by Blue Ridge is civil conspiracy. It is well established that “liability for civil conspiracy rests upon the existence of an underlying wrong and [that] if the underlying wrong provides no cause of action, then neither does the conspiracy.” Jones v. BP Oil Co., 682 So.2d 435, 439 (Ala.1993). Because Blue Ridge has no actionable conspiracy claim, the defendants were entitled to a summary judgment on this claim.
V.
ALDOT had immunity and the defendant officers and employees of ALDOT are also entitled to immunity, on the ground that plaintiffs Blue Ridge and Estes presented no evidence creating a genuine issue of material fact on the question whether the defendant officers and employees acted willfully, fraudulently, maliciously, or in bad faith. Consequently, we grant the petition for the writ of mandamus. The trial court is directed to grant the defendants’ motions for summary judgment.
WRIT GRANTED.
HOOPER, C.J., and HOUSTON, COOK, SEE, LYONS, BROWN, and ENGLAND, JJ., concur
JOHNSTONE, J„ dissents.

. §§ 801.01(a), 801.03(a), and 802.06, of the Alabama Standard Specifications, 1992 edition, and supplemental specification 4-92(2).

. Blue Ridge conducted business by supplying the State's road-construction contractors with chert gravel and sand for them to use as a coarse aggregate; a coarse aggregate is necessary to bind the tar.

. Spring Hill Lighting & Supply Co., 662 So.2d at 1151.