LYONS, Justice.
Heath Wright and his parents, Betty *325 Wright and Solomon Wright,[1] sued Donald Spivey, Jerry Peacock, and others, on theories of negligence and wantonness for injuries Heath sustained while operating a stationary spindle wood shaper in a building-construction class at a public school. Peacock and Spivey each moved for a summary judgment, arguing, among other things, that they were entitled to State-agent immunity. The trial court denied their summary-judgment motions. Peacock and Spivey petitioned this Court for a writ of mandamus directing the trial court to enter a summary judgment for them on the basis that they are entitled to State-agent immunity. We grant the petition and issue the writ.

Facts

Jerry Peacock is a vocational teacher and Donald Spivey is the career and technical director at the Houston County Career and Technical Center (“the vocational center”). During the week of August 20, 1999, Peacock’s class, in which Heath Wright was a student, was making raised-panel doors. As part of the project, the students were to use a model W-SS3 spindle wood shaper manufactured by Jet Equipment and Tools, Inc., to make straight cuts on three sides of a board and an arched cut on the fourth side. The shaper has “infeed” and “outfeed” “fences” positioned lengthwise on the right and left sides of the blade, respectively, from the perspective of the operator. The fences assist the operator in guiding the wood into the blade.
The owner’s manual for the shaper states: “Keep guards in place and in working order” and “Never perform shaping operation with safety guard removed.” Under the heading, “Shaping When Using the Fence as a Guide,” the owner’s manual states, “shaping with the fence is the safest and most satisfactory method of working and this method should always be used when the work permits. Almost all straight work can be used with the fence.” Peacock testified that he had not read the owner’s manual for this specific shaper because the shaper was transferred from another school and the owner’s manual did not come with it. He testified, however, that he had read the owner’s manual for a smaller shaper he had ordered. A label affixed to the shaper with the heading “SAFETY RULES” also states, in part, “CAREFULLY READ INSTRUCTION MANUAL BEFORE OPERATING MACHINE,” and “DO NOT OPERATE WITHOUT ALL GUARDS AND COVERS IN POSITION.” (Capitalization in original.)
Peacock’s class used a textbook titled Modem Cabinetmaking. Peacock photocopied portions of the textbook for the students to read. Peacock testified in his deposition that he had reviewed the entire textbook. The textbook includes a discussion of spindle shapers similar to the one that injured Heath. The textbook’s directions for installing the spindle shaper include the following:
“Install a point of operation guard. One is the clear plastic spindle guard.... It fits on the spindle under the washer and rotates with the cutter. Another is the ring guard which is clamped to the table and positioned just above the cutter and spindle.”
Immediately following this statement is a section titled “Shaper Setup and Operation”; that section states:
*326 “There are a number of options for operating a spindle shaper. These include using:
“1. Fences.
“2. A collar and starting pin.
“3. A collar, starting pin, and template.
“4. Various jigs.”
Following this statement is a discussion titled “Shaping with fences,” which begins, “Install infeed and outfeed fences when cutting straight edges.” Following this discussion of the use of fences is a section titled “Shaping with a collar and starting pin,” which includes the following:
“A collar and starting pin are used when the fence is not appropriate. This may be for shaping irregular curves.
[[Image here]]
“A ring guard or plastic spindle mounted guard must be attached....
[[Image here]]
“The procedure for setting up and using a collar and starting pin is as follows:
[[Image here]]
“2. Install the diameter collar which will give you the depth of cut desired. The collar should be above the cutter. This is generally safer.
[[Image here]]
“4. Thread a starting pin into a hole on the shaper table on the infeed side of the cutter.
[[Image here]]
“7. Install the ring guard within 1/4 in. (6 mm) of the upper workpiece surface.
“8. Turn the spindle by hand to be sure it spins freely. It must not touch the guard.... ”
Moreover, in a chapter titled “Health and Safety,” the textbook also states:
“Point of Operation (PO) guards protect your hands or body from the cutting tool. They also protect the operator from flying chips.... PO guards are made of metal or high impact plastic. Clear plastic allows you to observe your work safely. Often PO guarding is moved for tool setup or adjustments and must be reinstalled. A majority of accidents occur when PO guards have not been positioned correctly. New machinery is required to have PO guards. Retrofit older equipment with PO guards.”
Peacock testified in his deposition that he had written the courses of study for building-construction technology, carpentry, and eabinetmaking in “Alabama Course of Study: Trade & Industrial Education” (“the Course of Study”), a manual published by the State Department of Education. The building-construction technology section of the Course of Study states: “Students will ... [a]pply safety rules, regulations, and procedures.” The Course of Study then lists types and sources of such safety rules including regulations promulgated by the Occupational Safety and Health Administration (“OSHA”). It is undisputed that OSHA regulations concerning woodworking machines are not binding as a matter of law in Alabama public schools. However, Peacock testified, “[W]e use their standards as a good practice.” The following regulations promulgated by OSHA were in effect at the time of the accident:
“ § 1910.212 General requirements for all machines.
“(a) Machine guarding — (1) Types of guarding. One or more methods of machine guarding shall be provided to protect the operator and other employees from the machine area from hazards such as those created by point of operation ....
[[Image here]]
“(3) Point of operation guarding, (i) Point of operation is the area on a machine where work is actually performed upon the material being processed.
*327 “(ii) The point of operation in machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standard therefor, or in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.
[[Image here]]
“ § 1910.213 Woodworking machinery requirements.
[[Image here]]
“(m) Wood shapers and similar equipment. (1) The cutting heads of each wood shaper, hand-fed panel raiser, or other similar machine not automatically fed, shall be enclosed with a cage or adjustable guard so designed as to keep the operator’s hand away from the cutting edge....”
Peacock testified in his deposition that his responsibilities are derived from the Course of Study, his job description, and the “Houston County Center for Career and Technical Education Faculty Handbook and Policies and Procedures” (“the faculty handbook”). In addition to the responsibility of teaching students job-related skills, Peacock’s job description includes the following:
“F. Facilities and Equipment
[[Image here]]
“3. Order new equipment and supplies following procedures set by the Houston County School Board.
[[Image here]]
“6. Evaluate, select, and requisition books, instructional aids, equipment, and other instructional supplies..
[[Image here]]
“I. Safety
“1. Insure safety in the program by regular organized instruction in job safety and related safety practices related to the job tasks.
“2. Report hazards which you cannot correct to the vocational director.”
The faculty handbook states, in relevant part:
“Safety should complement the instructional program to the extent that all instructors should check their laboratories each day before the class session begins to ascertain that conditions are safe for the instructional program. All hazards should be removed or reported to the director immediately.”
As director, Spivey is Peacock’s supervisor. Spivey testified in his deposition that his responsibilities were derived from his job description. Spivey’s job description states, in part: “I. Safety. Implement safety instruction and practices as an integral part of all vocational programs.” Spi-vey testified that this meant that he was required to “check all programs to determine if safety is being taught in the course of study,” and to ensure that teachers practice safety. Spivey also testified that it was his responsibility to ensure that teachers teach students the proper and safe cutting techniques on the shaper and that he would not approve of any machine or technique he deemed to be unsafe. Spi-vey testified, “[I]f the machine was not as safe as it should have been ... it should have been taken out.” However, Spivey testified that “[t]hat machine had everything on it we were aware of.”
The shaper was purchased from Jet Equipment by the Houston County school system before or during 1986. The shaper had been used at another high school in Houston County by another vocational teacher before it was transferred to the vocational center in approximately 1987. Peacock testified that the shaper had never had a ring guard or a spindle guard *328 from the time it was transferred to the vocational center. Peacock farther testified that he knew of no point of operation guard that could be ordered to fit the shaper. Peacock testified, “[I]n using my discretion, there was no spindle guard that I felt would work on the machine. And the ring guard — for a machine of that size, there was no place for a ring guard to go on, without altering that machine.” Spivey also testified that he was unaware of any additional safety guards that could have been placed on the shaper.
Peacock testified that he had made inquiries about the availability of additional guards. Concerning the availability of additional guards, the following exchange occurred:
“Q: [I]n this textbook, under ‘Point of operation guards,’ it says, ‘Retrofit older equipment with point of operation guards.’
“A: Yes, I see that.
“Q: My question to you is, why was that not done?
“A: I am not aware of any point of operation guard that goes on that particular machine. I’ve researched, checked. And, in my opinion, the machine was safe.
“Q: ... You said you are not aware of a point of operation guard for that machine?
“A: For that particular size machine. Correct.
[[Image here]]
“Q: Did you check to see if there are any spindle guards available?
“A: Yes, I did.
“Q: Who did you check with?
“A: As a matter of fact, when I was in Birmingham, I always go to Birmingham Saw Works. I inquired about the different machines that I have, to stay updated with any new things that are coming out on the market.
“Q: Did you call Jet [Equipment]?
“A: Me, personally, no.
“Q: Did you have someone contact Jet [Equipment]?
“A: I remember talking with Wells Supply. ‘Cause, I had a Jet already. And I inquired about anything that should have been on that particular machine.
“Q: And what did Wells tell you about a guard for that particular machine? Did they tell you one was not available?
“A: That was not the words that I can remember them using. What I remember is that that was the way that the machine is sold, and that’s everything that was.... ”
(Remainder of answer not submitted in petition for writ of mandamus.) Moreover, Peacock testified, “I was at the international trade show in August of 2000, and I looked at every conceivable brand.... And I have not seen a ring guard on the larger shapers.” Peacock has a smaller shaper that was also used by the woodworking students, including Heath, in constructing their projects. Peacock testified that he ordered the smaller shaper from the manufacturer and that it came with a ring guard.
Steve Holbrook, Jet Equipment’s corporate representative, testified as follows concerning the spindle guard: “The sole purpose of this guard is to cover the spindle, so you don’t get your clothes or something caught in that spindle itself. It has very little to do with the cutter.” Hol-brook testified that the shaper should have had a spindle guard and that it should have been used by Peacock. Holbrook further testified, “If I were cutting this *329 board along the side ... I would prefer to have both fences in place.”
Wright also offered the deposition of “Dr. Benedict,” who apparently is an expert witness for the Wrights. However, the Wrights do not identify Benedict’s position or his qualifications. Benedict testified that Peacock should have used both fences on the shaper when the students were making straight cuts and that Peacock “took a shortcut” by removing the outfeed fence. Benedict testified that the accident would not have occurred if both fences had been in place. Benedict further testified, “[I]t doesn’t appear to me that any [point of operation] guard ever was with the machine. And it should have been when it was sold.” Benedict testified that Peacock should have “[ojrdered [a point of operation guard] and not used [the shaper] until he had one.”
Richard Otterbein, an expert witness for Peacock and Spivey, testified that the fences have a safety component to them because they permit the user to perform a guided cut. Otterbein agreed with the statement in the textbook that “[sjhaping with the fence is the safest and most satisfactory method of working, and this method should always be used when the work permits.” Otterbein also testified that the setup Heath was using at the time of his injury “was the safest way to do it.” However, Otterbein further testified that the fence and guards should have been used for the type of cut Heath was making.
Before class began on the date of the accident, Peacock set up the shaper for the students’ use. Peacock removed the out-feed fence, left the infeed fence in place, and made sure that a “rub collar” was in place. Peacock also had the students use a “starting pin.” Peacock testified that he believed this setup was “more or less in line with” a photograph in the textbook depicting the operation of the shaper when making irregularly shaped cuts — with a collar and a starting pin and without fences. Peacock testified that he believed that there was no way to make the machine safer than it was at the time of Heath’s injury. Peacock further testified that the specific cut Heath was making at the time of his injury — a straight cut— could have been made with both fences in place.
Before the students began to use the shaper on the day Heath was injured, Peacock demonstrated how to use the shaper to perform the assigned cuts. Heath testified that Peacock also demonstrated how to safely operate the shaper and told them to avoid coming in contact with the cutter. Peacock had also required the students to take written safety tests. Peacock testified that the students were all wearing safety goggles or glasses on the day Heath was injured. Heath had never used the large shaper before the day he was injured. However, Heath had used the smaller shaper earlier in the week.
Peacock supervised each student as he or she used the shaper. The students did not make all of their cuts at one time. They took turns using the machine, each cutting one side of the board during each turn at the machine. Peacock testified that Heath successfully completed the arched cut and two of the straight cuts during previous turns at the machine. Peacock also testified that Heath successfully completed the final cut, a straight cut, before he was injured. Peacock testified, “I watched him, after the board had passed the cutter. And the last step that he had to do was turn the machine off. And, at that point, when the cut was completed, I remember stating, ‘Good job.’ And the last operation was just to turn the machine off.” Peacock testified that he did not witness Heath’s hand coming in contact with the blade because some stu *330 dents were standing between Heath and Peacock.
Heath’s version of how the injury occurred contradicts Peacock’s testimony. Heath testified that the injury occurred when he was approximately halfway finished with his cut. Heath testified as follows concerning the circumstances of his injury:
“Q: How did your right hand get into that cutter, if you know?
“A: The best I can remember is, see, I was keeping pressure to keep it up against the fence.
“Q: You were pushing it up against the fence with the right hand?
“A: To keep it straight. And when I got over here, that board was already halfway through and I had pressure on it right here.
“Q: Did you keep having pressure on it with your right hand, too?
“A: Yes, sir.
“Q: It was still up against the fence?
“A: Yes, sir. And all of a sudden it just — that’s all I can remember, it happened so quick.”
Heath severed one finger and part of his thumb and severely cut another finger on his right hand.
The Wrights sued several defendants, including Peacock and Spivey in their individual capacities. The Wrights alleged that Peacock and Spivey had been negligent and wanton (1) in failing to supervise and/or instruct Heath in the proper use of the shaper, (2) in allowing Heath to operate a defective or improperly designed machine, (3) in failing to inspect the shaper to assure that it was in proper working order and safe for use by the students, (4) in failing to implement or to follow guidelines or rules for the proper and safe use, and the proper safety inspection of, the shaper, (5) in failing to prevent an unsafe condition from developing, (6) in failing to provide the proper safety equipment for use with the shaper, and (7) in failing to properly maintain the shaper. Peacock and Spivey filed motions for a summary judgment arguing, among other things, that they were entitled to State-agent immunity. The trial court denied their motions for summary judgment, specifically finding that they were not entitled to State-agent immunity; it attempted to make the judgment a final appealable order pursuant to Rule 54(b), Ala. R. Civ. P. Peacock and Spivey filed both an appeal (case no. 1011225) and a petition for a writ of mandamus. On May 9, 2002, we dismissed the appeal.

Discussion

Peacock and Spivey petition this Court for a writ of mandamus directing the Houston Circuit Court to enter a summary judgment in their favor. A writ of mandamus is an extraordinary remedy available only where there is: “ ‘ “(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.” ’ ” Ex parte Maxwell, 812 So.2d 333, 334 (Ala.2001) (quoting Ex parte Empire Fire & Marine Ins. Co., 720 So.2d 893, 894 (Ala.1998), quoting in turn Ex parte United Serv. Stations, Inc., 628 So.2d 501, 503 (Ala.1993)).
The Wrights argue that a writ of mandamus is inappropriate in this case because, they say, Peacock and Spivey have another adequate remedy available to them — an appeal from the trial court’s denial of their motions for a summary judgment. ‘While the general rule is that the denial of a motion for summary judgment is not reviewable, the exception is that the denial of a motion for summary judgment *331 grounded on a claim of immunity is reviewable by petition for writ of mandamus.” Ex parte Rizk, 791 So.2d 911, 912 (Ala.2000). See also Ex parte Alabama Dep’t of Mental Health & Mental Retardation, 837 So.2d 808 (Ala.2002); Ex parte City of Gadsden, 781 So.2d 936, 937 (Ala.2000). On May 9, 2002, we dismissed Peacock’s and Spivey’s appeal from the denial of their summary-judgment motions. Thus, the Wrights’ argument that Peacock and Spivey have available to them another adequate remedy is not well taken.
In Ex parte Cranman, 792 So.2d 392 (Ala.2000), we restated the rule governing State-agent immunity:
“A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
“(1) formulating plans, policies, or designs; or
“(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“(a) making administrative adjudications;
“(b) allocating resources;
“(c) negotiating contracts;
“(d) hiring, firing, transferring, assigning, or supervising personnel; or
“(3) discharging duties imposed on a department or agency by statute, rule or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
“(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
“Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
“(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.”
792 So.2d at 405 (emphasis added). See also Ex parte Butts, 775 So.2d 173 (Ala.2000).
The Wrights’ claims against Peacock arise from Peacock’s removal of the shaper’s outfeed fence and his permitting Heath to use the shaper without certain other guards. The Wrights claim that Spivey is vicariously liable for Peacock’s actions and that Spivey failed to properly supervise Peacock to ensure that proper safety measures were being taught and practiced and to ensure that the shaper was properly equipped. “State-agent immunity protects agents of the State in their exercise of discretion in educating students.” Ex parte Blankenship, 806 So.2d 1186, 1190 (Ala.2000). See also Cranman, 792 So.2d at 405. A State agent is also immune from civil liability for exercising judgment in supervising personnel. Cranman, 792 So.2d at 405. The Wrights’ actions against Peacock and Spivey arise from decisions they made in edu- *332 eating students and in Spivey’s supervision of Peacock, categories specifically included within the Cranman restatement of the rule governing State-agent immunity. 792 So.2d at 405. Nevertheless, the Wrights argue that Peacock and Spivey were engaged in a ministerial act and that they were not “exercising judgment” because they disobeyed clear rules and regulations concerning the use of the shaper. Specifically, the Wrights cite passages from Peacock’s and Spivey’s job descriptions, the faculty handbook, a warning label on the shaper, the owner’s manual for the shaper, the Course of Study written by Peacock and distributed by the State Board of Education, and selected OSHA regulations.
First, the textbook passages, warning label, and owner’s manual do not constitute “duties imposed by statutefs], rule[s] or regulations” that educators are required to strictly follow at the risk of abrogating their State-agent immunity and subjecting themselves to civil liability if they fail to do so. Cranman, 792 So.2d at 405. The Wrights assert that the State Department of Education textbook committee approved the textbook. However, there is no evidence before this Court indicating that the textbook, or, for that matter, the warning label or owner’s manual, was approved or even reviewed by any governmental agency. We therefore do not reach the question whether approval of a textbook automatically converts every statement in the textbook to specific ministerial duties imposed upon the teacher by the State Department of Education.
Even assuming that the teacher was under a ministerial duty to follow to the letter the textbook and the owner’s manual, an analysis of the textbook and the manual does not support the conclusion that the use of the shaper without fences renders the shaper unsafe. The textbook and owner’s manual are the only sources the Wrights cite that include any discussion of the use of fences. The textbook and the manual indicate that the purpose of the fences is to permit the operator to make a guided straight cut. The owner’s manual states that “shaping with the fence is the safest and most satisfactory method of working and this method should always be used when the work permits,” and that “[a]lmost all straight work can be used with a fence.” (Emphasis added.) The textbook indicates that fences should be installed when making straight cuts. It then details the use of the shaper without fences in order to make curved cuts.
Although both the owner’s manual and the textbook can be read as stating that the use of fences is the safest method when making straight cuts, neither states that using the shaper without fences is unsafe. Further, the textbook and the manual both contemplate using the shaper without fences in order to accomplish curved cuts. Based on the foregoing, the removal of the fences does not render the shaper unsafe. Thus, even if the textbook and the owner’s manual were sources of rules or regulations with the authority to bind Peacock, Peacock would still be entitled to exercise judgment in determining on what occasion to remove the fences and when to retain them “when the work permits.” With the benefit of hindsight, one might question the wisdom of Peacock’s decision concerning the removal of the fences to accommodate the students’ objectives. Nevertheless, Peacock was immune from liability predicated upon the exercise of his judgment in educating students, and we may not second-guess his decision. Blankenship, 806 So.2d at 1190.
The Wrights also contend that Peacock and Spivey failed to adhere to the provisions regarding safety in their respective job descriptions and in the faculty *333 handbook. Peacock’s job description was issued by the Houston County Board of Education. It includes among his responsibilities: to teach students vocational skills, to “insure safety” by instructing students in safety practices and to “[rjeport hazards which you cannot correct to the vocational director.” The faculty handbook states that “[sjafety should complement the instructional program.... ” Although each of these passages imposes upon Peacock a general responsibility to ensure safety in his classroom, these general statements do not remove from Peacock his judgment in determining the safe operation of the tools or when a safety hazard exists. These are not the type of “detailed rules or regulations” that would remove a State agent’s judgment in the performance of required acts. Ex parte Butts, 775 So.2d at 178. See also Bayles v. Marriott, 816 So.2d 38, 42 (Ala.Civ.App.2001). Similarly, the general requirement imposed by Spivey’s job description that he “[ijmplement safety instruction and practices” does not remove Spivey’s judgment in determining whether Peacock was properly teaching and practicing safe operation of the shaper. Ex parte Butts, 775 So.2d at 178. See also Bayles, 816 So.2d at 41-42.
The Wrights also contend that Peacock and Spivey failed to comply with applicable OSHA regulations, which, the Wrights say, the Course of Study made mandatory. The Course of Study, written by Peacock and distributed by the State Department of Education, states that students “will ... apply safety rules, regulations and procedures.” It then lists OSHA regulations as one of a number of sources and types of such safety rules and regulations. The applicable OSHA regulations require guards to be used on wood shapers. OSHA Woodworking machinery requirements 29 C.F.R. § 1910.213(m)(l)(1996). However, it is undisputed that no spindle guard or ring guard was included with the shaper when it was transferred to the school. It is also undisputed that Peacock inquired about guards for the shaper but was unable to locate such guards. Peacock concluded that such additional guards were not available for this model shaper. Peacock, a shop teacher with over 20 years’ experience, acted within his judgment in determining that retrofitting equipment for the shaper was not available and that it was reasonably safe to use the shaper under his close personal supervision without additional guards. Cranman, 792 So.2d at 405.
The Wrights also argue that Peacock is nevertheless not entitled to State-agent immunity because he acted ■willfully in removing the outfeed fence, in failing to retrofit the shaper with additional guards, and in permitting the machine to be used without those devices. Even when a State agent is otherwise entitled to State-agent immunity, the State agent is, nevertheless, not entitled to immunity for his willful conduct. Butts, 775 So.2d at 178, Cranman, 792 So.2d at 405, Wright v. Wynn, 682 So.2d 1, 2 (Ala.1996). The burden is on the plaintiff to establish that the State-agent defendant acted willfully. “Once a defendant demonstrates that a plaintiffs claims arise from the performance of a discretionary function, the burden then shifts to the plaintiff to establish that the defendant acted in bad faith or with malice or willfulness in order to deny the defendant [State-agent] immunity from suit.” Ex parte Davis, 721 So.2d 685, 689 (Ala.1998).
The Wrights argue that the definition of “willful conduct” contained in the Alabama Workers’ Compensation Act, § 25-5-11(c)(2), Ala.Code 1975, should apply to this case. Section 25-5-ll(c)(2) defines *334 “willful conduct” to include “[t]he willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from such removal.Even assuming that this definition from the Workers’ Compensation Act applies to cases involving State-agent immunity, Peacock’s actions do not meet this definition.
It is undisputed that Peacock sought additional guards for the shaper, but he was unable to locate such guards. Although, as previously noted, Peacock exercised his judgment in removing the outfeed fence from the subject shaper, there is no evidence indicating that Peacock removed any safety guard from the shaper. Moreover, there is no evidence indicating that Peacock had any “knowledge that injury ... would likely or probably result” from the use of the shaper without the guards and the outfeed fence. § 25-5-ll(c)(2). In fact, Peacock testified that he believed that the shaper was safe. Peacock’s actions were not “willful.” Thus, the Wrights have not satisfied their burden to establish that Peacock acted wilfully. Ex parte Davis, 721 So.2d at 689.
Given our conclusion that both Peacock’s and Spivey’s actions meet the test for State-agent immunity contained in the Cranman restatement, we further conclude that Peacock and Spivey have a “clear legal right” to summary judgments in their favor. Ex parte Duvall, 782 So.2d 244, 248 (Ala.2000). The trial court is ordered to vacate its order denying summary judgments for Peacock and Spivey and to enter summary judgments in their favor.
PETITION GRANTED; WRIT ISSUED.
HOUSTON, SEE, BROWN, JOHNSTONE, HARWOOD, WOODALL, and STUART, JJ., concur.
MOORE, C.J., concurs in the result.

. Heath Wright was a minor when this action was filed. He sued by and through his next friends and parents, Betty Wright and Solomon Wright. Betty Wright and Solomon Wright alleged loss-of-consortium claims in their individual capacities. It appears that Heath Wright has now reached the age of majority.